**AMERICAN–MARIETTA COMPANY,**
**Appellant and Appellee,**

v.

**Harry KRIGSMAN and Harold Miller**
**D/B/A Jamick Manufacturing Co.,**
**Appellees and Appellants.**

**No. 142, Docket 25789.**

United States Court of Appeals
Second Circuit.

Argued Jan. 13, 1960.

Decided Feb. 16, 1960.

R. Howard Goldsmith, Chicago, Ill., Alexander, Maltitz, Derenberg & Sullivan, Louis Kunin, New York City, for plaintiff-appellant. James W. Clement, Schneider, Dressler, Goldsmith & Clement, Chicago, Ill., of counsel.

Kenyon & Kenyon, New York City, for defendants-appellees. Ralph L. Chappell, Richard A. Huettner, New York City, of counsel.

Before HAND, HINCKS and WATERMAN, Circuit Judges.

HAND, Circuit Judge.

These are appeals by both parties from an interlocutory order of the District Court for the Eastern District of New York (Byers, J. presiding) in an action against the defendants for unfair competition in the sale of "sponge mops." The order refused to enjoin the sale of the defendants' mop under its trade-name "Crown 400 Mop," but did enjoin selling separate sponges as "refills" under the legend: "This refill fits the O-Cedar 76 and Crown 400." The plaintiff is an Illinois corporation and the two defendants are residents of Brooklyn, so that the jurisdiction of the District Court is based on diversity of citizenship. The facts are undisputed. A Canadian citizen, named Greenleaf, procured two United States patents—one in 1950 for a "back presser mop"; and the other in 1952 for the "sponge element" of the mop. It is not necessary to describe the disclosures beyond saying that the mops consisted of long handles with a horizontal flat metal carrier at the end, to which was fastened a "cellulose sponge or other equivalent highly absorbent material." At one edge of the carrier a "presser plate" was hinged which could be rotated by an attached handle so as to squeeze the water out of the sponge through twelve horizontal slots piercing the "presser plate" in three rows of four each. The sponge was a trapezium in section with the shorter edge towards the hinged edge of the "presser plate"; it had a "stiffening plate" on one side carrying screwends by which it could be attached to, and detached from, the carrier. Both applications were filed on December 21, 1948, and on April 25, 1949, the plaintiff's "predecessor," the "O-Cedar Corporation" obtained from Greenleaf an exclusive license for the United States to make and sell both the mops and the sponges. The "O-Cedar Corporation" was later absorbed into, and became a part of, the plaintiff, which continued to make and sell under the license until November, 1957 when it surrendered the license to Greenleaf's representatives; and it then began to make and sell mops varying only slightly from those made under the patents. These it called "New O-Cedar 76." After November, 1957, the defendants made and sold the patented mop under the name, "Crown 400," and

put upon the "refills" the legend we have already mentioned: "This refill fits the O-Cedar 76 and Crown 400"; they have never used the name, "O-Cedar" in any other way. The sales of the plaintiff and its "predecessor" have been exceedingly large, and it has guaranteed its mops for five years.

First, we will consider the plaintiff's claim that it was "unfair competition" for the defendants to sell the "Crown 400 Mop" under that name; and next we will consider whether it was "unfair" to state that the defendants' sponges would fit the "O-Cedar 76" mop. Since no part of the claim is founded on the "copyright, patent or trademark laws" the "claim of unfair competition" is not within § 1338(b) of Title 28. Jurisdiction therefore depends upon diversity of citizenship and the law of New York determines the parties' rights.[1] It is argued that the law of that state does not confine "unfair competition" to the invasion of a "secondary meaning" by copying "non-functional" features of a product; and that is apparently true, Santa's Workshop v. Sterling, 282 App. Div. 328, 122 N.Y.S.2d 488; Avon Periodicals, Inc. v. Ziff-Davis Pub. Co., 282 App.Div. 200, 122 N.Y.S.2d 92, though scope of the doctrine, as so extended, is not clear. The whole basis of the law of "unfair competition" in this aspect is that no one shall sell his goods in such a way as to make it appear that they come from some other source. The simplest form of this is to use the name or trademark of another, but the law goes further than that. If the goods have certain features that have no significance as to the provenance of the goods, yet have come to have a "secondary meaning" which may mislead buyers into sup-

posing that they come from a source on which the buyers rely, those features may not be copied. That is the doctrine of "non-functional" copying, and is limited to those features of the original goods that are not in any way essential to their use. If in addition to being "non-functional" these features have indeed come to signify origin in the minds of buyers, a second comer in the field will be forbidden to incorporate those features into the design of his own wares; the chance that this will deflect buyers who would otherwise buy of the putative other source cancels the second comer's privilege of reproducing the original, which he has in common with the public at large.

It is this doctrine that the plaintiff invokes, though it apparently misconceives its scope.[2] The appearance of defendants' "Crown 400" mop is so like that of the plaintiff's "New O-Cedar 76" that it is quite likely that buyers or users may suppose that they come from the same producer; and the plaintiff seems to suppose that this is enough to require the defendants in some way to disabuse buyers of any such inference. So far as we know, no court has ever so held, and it would in effect give a design patent upon the appearance of the article. Having no such patent the plaintiff must be content to allow the defendants to copy its mop provided there are no "non-functional" features in the "O-Cedar 76" which the "Crown 400" has taken over. The only such feature that is even suggested is the twelve horizontal "slots" in the "presser plate," which both parties took from the disclosure of the patents. That is not one of the elements in the claims, and indeed the disclosure expressly declares that, although the "presser

1. Maternally Yours, Inc. v. Your Maternity Shop, 2 Cir., 234 F.2d 538; Norwich Pharmacal Co. v. Sterling Drug Co., 2 Cir., 271 F.2d 569; Speedry Products Inc. v. Dri Mark Products, Inc., 2 Cir., 271 F.2d 646.

2. Enterprise Manufacturing Co. v. Landers, Frary & Clark, 2 Cir., 131 F. 240; Crescent Tool Co. v. Kilborn & Bishop Co., 2 Cir., 247 F. 299; General Time Instruments Corp. v. United States Time Corp., 2 Cir., 165 F.2d 853; Lucien Lelong, Inc. v. Lander Co., 2 Cir., 164 F.2d 395; Charles D. Briddell, Inc. v. Alglobe Trading Corp., 2 Cir., 194 F.2d 416; Speedry Products, Inc. v. Dri Mark Products, Inc., 2 Cir., 271 F.2d 646; Norwich Pharmacal Co. v. Sterling Drug Co., 2 Cir., 271 F.2d 569.

plate" "is formed of a metal grid having spaced openings, 16, and reinforcing ribs, 17, * * * other forms of presser grids may of course be utilized." (Pat. 2,515,408, Col. 4, lines 29–32.) Moreover, it is true that the slots are "nonfunctional" in the sense that the mop will work as well with openings of another shape, as for example those in the "New O-Cedar 76" which are not "slots" at all. Hence the first condition upon a "secondary meaning" is fulfilled. On the other hand there is not a jot or tittle of evidence to suggest that the slots in the original mop misled buyers into supposing that the "Crown 400" came from the same source as the "O-Cedar 76." It is indeed quite likely that buyers have assumed an identity of origin to the two mops from their general similarity; it is even possible—though we should suppose it very unlikely—that the identical form of the "slots" may have contributed to that assumption, but one who seeks to enjoin the reproduction of what is in the public domain must affirmatively show that the copied features were the reason for the confusion; it is not enough that perhaps it *may* have contributed: and this is especially relevant in the case at bar because the same feature—a series of twelve parallel slots,—had twice already appeared (Exhibits S.P. 16 and S. P. 64) with the only difference that the slots were not horizontal but at an angle of less than 45°. It is perhaps conceivable that upon the trial the plaintiff may be able to prove that twelve horizontal "slots" had become the earmark, so to say, of the "O-Cedar 76"; but upon a motion for preliminary injunction, no such inference is to be presumed. So far as concerns the mop itself, the claim was not proved.

■ As we have said, the parties' rights in this case depend upon the law of New York, and the law of "unfair competition" of that state is not confined to the doctrine of "secondary meaning." On the other hand, we have determined the parties' rights without recourse to any New York decisions. We have done this deliberately because we have found no New York decisions that are appropriate to the situation at bar. We are therefore thrown back upon the law as laid down in other jurisdictions, especially by federal courts, because it has seemed to us that in the absence of local contrary decisions the courts of New York are likely to adopt the same doctrines, which incidentally also appear to us best to cover the situation. That the law of New York is not limited by the doctrine of "secondary meaning" does not mean that the courts of that state repudiate what has been laid down elsewhere, until they have given some intimation of a contrary purpose.

There remains the legend printed upon the defendants' "refill" which we have twice quoted. This clearly distinguished between the two mops, and does not suggest that the refill comes from the plaintiff, unless the reader has been already misled into supposing that the maker of the "Crown 400" was the same as the maker of "O-Cedar 76," for which, as we have just said, there is no support in the record. If these two mops are not so confused, the claim must be that the defendants may not sell their "refill" to be used in the plaintiff's mop, and that the defendants certainly may do.[3] It is true that the defendants for a time did wrap their refills in a cellophane cover which closely imitated the cover of the plaintiff, but this they have now changed and the new cover is at once distinguishable from the plaintiff's.

The evidence of "passing off" "Crown 400" mops to buyers who asked for "O-Cedar 76" mops did not implicate the defendants. Two of the plaintiff's emissaries went to the same shop in New Jersey, asked for an "O-Cedar Sponge Mop"; and were sold the "Crown 400." That was "unfair competition" by the shop servants and perhaps also by the

3. Electric Auto-Lite Co. v. P. & D. Manufacturing Co., 2 Cir., 78 F.2d 700; Columbian Art Works v. Definance Sales Corporation, 7 Cir., 45 F.2d 342; Myles Standish Manufacturing Co. v. Champion Spark Plug Co., 8 Cir., 282 F.R. 961.

shop, but it was not evidence against the defendants.

In what we have said we have assumed for argument that the plaintiff continues to have a legally protected interest in the name, "O-Cedar 76," although it has discontinued to use it, and has substituted "New O-Cedar 76." We do not, however, wish to be understood as deciding that question.

The order is affirmed so far as it denied any injunction against the manufacture and sale of the "O-Cedar 76," under the name "Crown 400." The order is reversed so far as it enjoined the defendants from using upon its "refill" sponges the legend: "This refill fits the O-Cedar 76 and Crown 400."

Sections of the order numbered 7, 8, and 10(a) are affirmed.