CHEVRON CHEMICAL COMPANY, a
Delaware Corporation,
Plaintiff-Appellant,

v.

VOLUNTARY PURCHASING GROUPS,
INC., a Texas Corporation, and Hi-Yield
Chemical Co., Defendants-Appellees.

No. 80–1729.

United States Court of Appeals,
Fifth Circuit.*
Unit A

Oct. 23, 1981.

Pillsbury, Madison & Sutro, Thomas E. Haven, W. Robert Buxton, Andrew J. Ogilvie, San Francisco, Cal., Thompson & Knight, Christopher W. Byrd, Gregory S. C. Huffman, Dallas, Tex., for plaintiff-appellant.

Arnold, White & Durkee, Bill Durkee, William Dean Raman, Houston, Tex., for defendants-appellees.

Before RUBIN, RANDALL and TATE, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge.

Plaintiff Chevron Chemical Co. ("Ortho") contends that Voluntary Purchasing Groups, Inc., and Hi-Yield Chemical Co. (together, "VPG") copied the packages in which it sells lawn and garden products thus infringing its trade dress and violating § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1976), and the Texas law of unfair competition.[1] Finding that VPG did deliberately copy Ortho's insignia, the district court denied relief on the grounds that the Lanham Act does not provide a cause of action for trade dress infringement and that Ortho failed to show, as required under applicable Texas law, either that its trade dress had acquired secondary meaning or that there was any likelihood of confusion on the part of consumers as to the respective sources of the competing products.

As to Ortho's federal claim, we conclude that earlier decisions of this Court compel the conclusion that the Act does provide a cause of action for trade dress infringement; Ortho was not required to show "secondary meaning," as that term is understood in trademark law, to prevail under that section; the district court applied an erroneous legal standard in finding no likelihood of confusion, thereby stripping that determination of the protection normally accorded fact findings under Rule 52(a), Fed.R.Civ.P.; and, at least with regard to one of the VPG packagings, Ortho demonstrated such a likelihood of confusion. Turning to Ortho's state claim under the Texas law of unfair competition, we assume *arguendo* both that Texas law requires proof of secondary meaning and the requisite proof by Ortho, but conclude that Or-

---

1. Ortho's complaint charged VPG with unfair competition under the laws of "various states." The district court, applying choice of law principles, held that Texas law governed Ortho's state claims. Neither party challenges this ruling.

tho's recovery under state law cannot be greater than the relief accorded it under § 43(a) since both require a similar showing of a "likelihood of confusion." Therefore, we reverse and remand so that the district court may enter an appropriate injunction and hold further proceedings consistent with this opinion.

## I.

Ortho manufactures agricultural chemicals. It is, and has been for many years, the leading seller of lawn and garden products, such as pesticides, weed killers, and fertilizers, for home consumption, such as home gardening.[2]

Ortho's management decided in 1949 to package and sell its more than 125 lawn and garden products in a uniform "family" trade dress. Since then, with few exceptions, it has packaged its products in trade dresses featuring the colors red and yellow. In 1971, it adopted the trade dress shown in black and white on Diagram 1 below.

VPG and its predecessors have also produced and marketed agricultural chemicals for many years; in 1974 it decided to introduce a new line of lawn and garden products under the trademark "Hi-Yield."[3] The district court found that, in designing its packaging, VPG intended to copy Or-

tho's trade dress as much as the law would allow, and consulted its attorney for advice in order to accomplish this end without violating the law.

The Ortho package shows a background composed of three horizontal bands of color; the top 20% is white, the next 30% is yellow, and the bottom 50% is red. Ortho's registered trademark, "ORTHO," is printed on the white band in bold black letters, along with the distinctive chevron mark of the Chevron companies. The yellow band contains the name of the particular product, e. g., Bone Meal, which is also printed in black letters. The red band contains the required warnings regarding toxicity, general information about the product and its ingredients, and a drawing suggestive of the uses of the product, e. g., the insects which a particular pesticide will eradicate. The printing in this red band is partly in black and partly in white. The back of the package is white and yellow; the top band is white and is the same width as the top white band on the front, and the rest of the back is yellow. The product's contents and directions for its use are printed on the back. Those Ortho products sold in liquid form come in bottles bearing a label identical to the design just described. The bottle itself is dark brown and has a yellow cap.

2. Agricultural chemicals are also sold to large-scale users of the products, such as farmers, but Ortho does not complain of VPG's competition for this market.

3. VPG sold lawn and garden products prior to 1974, but not under the "Hi-Yield" trademark, nor in the red and yellow trade dresses here complained of.

Diagram 1
VPG

Ortho's
Trade Dress

Trade Dress No. 1

By March 1976, VPG's new "Hi-Yield" line of lawn and garden products was on the retail shelf in its first trade dress ("Trade Dress No. 1"). The front view of VPG's Trade Dress No. 1 is shown on Diagram 1 above.

VPG's packaging shows a background virtually identical to Ortho's; *i. e.*, it is composed of three horizontal bands of white, yellow and red. The widths of the bands and the shades of the colors are practically indistinguishable from those on the Ortho packaging. VPG's trademark, "Hi-Yield," printed in red capital and small letters, appears in the white band. The yellow band, like Ortho's, contains the product name printed in similar black letters. The red band, also like Ortho's, contains warnings and descriptions of the product in small print. Again like Ortho's, the printing on VPG's Trade Dress No. 1 is vertically aligned on the left, but not on the right. The back of VPG's Trade Dress No. 1, unlike Ortho's, is solid white. VPG's bottles are dark brown, substantially the same size and shape as Ortho's, but the color of the cap is white, not yellow.

After Ortho protested VPG's use of Trade Dress No. 1, VPG revised it. By August 1976, VPG began using Trade Dress No. 2, below, which also features red, yellow, and white bands in shades virtually identical to those found on Ortho packaging, but in a five band combination: white, red, yellow, red, white. On Trade Dress No. 2, VPG's trademark "Hi-Yield" (in red) and the product name (in black) both appear on the large middle yellow band.

Shortly after August 1976, VPG, on its own initiative, made another revision. Trade Dress No. 3, shown below, uses only the colors red and yellow (although again in shades practically indistinguishable from those used by Ortho) arranged this time in a three band pattern of red, yellow, red. As in Trade Dress No. 2, the red "Hi-Yield" trademark and black product name appear in the middle yellow band.

VPG's final revision, Trade Dress No. 4, shown below, was adopted after this suit was filed, and is still used. Trade Dress No. 4 again uses the same shades of red and yellow, but now in only two bands: the top two-thirds of the package is yellow, and contains the red "Hi-Yield" mark and the black product name; the bottom third is red.

Diagram 2

VPG

Trade Dress No. 2

Trade Dress No. 3

Trade Dress No. 4

Ortho's complaint alleges that VPG's trade dresses constituted "false designations of origin" and "false representations" under § 43(a) of the Lanham Act and infringed Ortho's common law rights in its trade dress. Ortho demanded injunctive relief and an accounting. The trial was to the court, on the issue of liability alone.

Ortho first sought to prove that its trade dress had acquired secondary meaning. It offered evidence showing use of its trade dress from 1971 until the time of trial, evidence of extensive advertising depicting the packaged products, and the substantial amount of its sales of products thus packaged.

To show the likelihood of confusion, Ortho relied on the visual similarity between Ortho's and VPG's trade dresses and presented evidence demonstrating that Ortho's and VPG's products are sold through similar retail outlets to similar purchasers; Ortho's and VPG's products are advertised in at least one similar manner;[4] and employees of Ortho as well as those of independent retail outlets had been confused by the similarity in the trade dresses. Ortho did not, however, offer any evidence of actual consumer confusion.

The district court concluded that "merely using a confusingly similar trade dress does not constitute a false designation of origin or a false description or representation under § 43(a) of the Lanham Act." As to Ortho's state claim of unfair competition, the court concluded that Ortho failed to prove that its trade dress had acquired secondary meaning, saying there was "no evidence that consumers recognize the Ortho trade dress as distinctive or that the trade dress says 'Ortho' to them." Furthermore,

**4.** Ortho advertises its products in various ways, including radio, television, general circulation magazines, and point of sale displays. VPG, by contrast, advertises only through point of sale displays, which again are similar to Ortho's.

the district court found that none of VPG's trade dresses was likely to cause confusion. In making this determination with regard to Trade Dress No. 1, the court compared those "digits," or factors, tending to establish such confusion with those tending to diminish it. Among the former, the court listed "the similarity of the front of the packages" and the "inference of intentional copying." Those listed as diminishing the likelihood of confusion were VPG's "consistent display of its 'Hi-Yield' trademark," the "higher than average degree of care used by consumers in purchasing [lawn and garden] products," and the "absence of any evidence of actual consumer confusion after four years of competition." "In sum," the court concluded, "the factors against likelihood of confusion substantially outweigh the factors tending to show such likelihood." As to Trade Dresses Nos. 2–4, the court concluded that they were not confusingly similar to Ortho's, "and even dissimilar."

## II.

■ Section 43(a) provides:

Any person who shall ... use in connection with any goods or services, or any container or containers for goods, *a false designation of origin, or any false description or representation*, including words or other symbols tending falsely to describe or represent the same, ... *shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin* or in the region in which said locality is situated, *or by any*

*person* who believes that he is or is *likely to be damaged by the use of any such false description or representation.*

15 U.S.C. § 1125(a) (emphasis added). Thus, for a plaintiff to bring an action for trade dress infringement under § 43(a), the use of a confusingly similar trade dress must constitute either a "false designation of origin" or a "false description or representation."

■ At the outset, we reject the cases holding that the use of a confusingly similar trade dress constitutes a "false designation of origin."[5] This conclusion conflicts with the geographic meaning of the term "origin" as used in the Act. That the word is thus used is shown by the express language of § 43(a), which states that the user of a "false designation of origin" shall be liable to a civil action by "any person doing business *in the locality falsely designated* as that of origin ...." 15 U.S.C. § 1125(a) (emphasis added). See Germain, *Unfair Trade Practices Under Section 43(a) of the Lanham Act: You've Come a Long Way, Baby—Too Far, Maybe?*, 49 Ind.L.J. 84, 109–12 (1973) [cited as *Germain*]. We turn then to consider whether § 43(a) proscribes the false representation that implicitly underlies every claim of trade dress infringement—the false representation that the goods being sold by the defendant are produced or sold by the plaintiff.

■ The false representation part of § 43(a), read afresh, appears to create a federal cause of action based upon the common-law tort of "false advertising."[6] The

5. *See, e. g., Vibrant Sales, Inc. v. New Body Boutique, Inc.*, 652 F.2d 299, 303 (2d Cir. 1981); *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 372 (1st Cir. 1980); *Federal-Mogul-Bower Bearings, Inc. v. Azoff*, 313 F.2d 405, 408 (6th Cir. 1963) (alternate holding). *See also* Comment, *The Present Scope of Recovery for Unfair Competition Violations Under Section 43(a) of the Lanham Act*, 58 Neb.L.Rev. 159, 162, 165–67 (1978) [cited as *Nebraska Comment*].

6. *See* Bunn, *The National Law of Unfair Competition*, 62 Harv.L.Rev. 987, 998–1000 (1949); Callmann, *False Advertising as a Competitive Tort*, 48 Colum.L.Rev. 876, 885–86 (1948); *Germain, supra*, 49 Ind.L.J. at 85; *Developments in the Law—Competitive Torts*, 77 Harv.L.Rev.

888, 907–08 (1964); *Developments in the Law—Trade-Marks and Unfair Competition*, 68 Harv.L.Rev. 814, 881–882 (1955); *Nebraska Comment, supra* note 5, at 159.

In addition, in *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.*, 214 F.2d 649 (3d Cir. 1954), the case most often cited by the leading commentators as being the first correct interpretation of § 43(a), *see, e. g.*, 1 R. Callmann, The Law of Unfair Competition, Trademarks and Monopolies § 18.2(b) (2d ed. 1967) [cited as Callmann]; 2 J. McCarthy, Trademarks and Unfair Competition § 27:4(A), at 248 (1973); Derenberg, *The Seventh Year of Administration of the Lanham Trade-Mark Act of 1946*, 44 Trade-Mark Rep. 991, 1053–54 (1954), Judge Hastie explained § 43(a) thus:

type of false representation constituting the essence of this tort has always been understood to be an affirmative misrepresentation by the defendant (either through its advertising or otherwise in connection with its sales efforts) regarding the existence of certain qualities or characteristics that its goods do not in fact have.[7] Although even under this description of the common-law tort it could be argued as a matter of semantics that the source of a product is one of its qualities or characteristics, this type of misrepresentation has never been deemed covered by the doctrine of "false advertising."

Instead, false representations of the source of a product constitute the common-law tort of "unfair competition," or, as it is otherwise known, "passing off." Generally speaking, "unfair competition" in its technical sense[8] refers to a "defendant . . . passing off his goods or services as those of the plaintiff by virtue of substantial similarity between the two . . . ." *Boston Professional Hockey Association v. Dallas Cap & Emblem Manufacturing Co.*, 510 F.2d 1004, 1010 (5th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975). "The whole basis of the law of 'unfair competition' . . . is that no one shall sell his goods in such a way as to make it appear that they come from some other source." *American-Mar-*

*ietta Co. v. Krigsman*, 275 F.2d 287, 289 (2d Cir. 1960). "The simplest form of ['unfair competition'] is to use the name or trademark of another, but the law goes further than that." *Id.* It is therefore clear that trade dress infringement, like trademark infringement, is one variety of "unfair competition," not "false advertising."

In sum, the essential misrepresentation in "false advertising," which we have noted forms the basis of the "false representation" leg of § 43(a),[9] is fundamentally different from the essential misrepresentation in "unfair competition": in the former case, the defendant makes no secret of the origin of the goods in himself, but merely misrepresents certain qualities or characteristics that his goods may or may not have; in the latter case, the defendant misrepresents his goods to be those of another. As commentators have noted, it would have been anomalous for Congress to enact an entire statute, 45 sections in length, to define and protect trademarks by federal law and then in a passing reference to enact as federal the entire common law of unregistered marks and unfair competition. *See, e. g.*, Derenberg, *The Twenty-Fifth Year of Administration of the Lanham Trademark Act of 1946*, 62 Trade-Mark Rep. 393, 497 (1972); *Germain, supra*, 49 Ind.L.J. at 111.

It seems to us that Congress has defined a statutory civil wrong of false representation of goods in commerce . . . . Perhaps this statutory tort bears closest resemblance to the . . . tort of false advertising to the detriment of a competitor, as formulated by the American Law Institute . . . . *See* Torts Restatement [(First)], Section 761 . . . .

214 F.2d at 651. Section 761 of the Restatement (First) of Torts, entitled "False Advertising," provides:

One who diverts trade from a competitor by fraudulently representing that the goods which he markets have ingredients or qualities which in fact they do not have but which the goods of a competitor do have, is liable to the competitor for the harm so caused . . . .

7. The Restatement gives the following examples of the type of misrepresentation meant to be proscribed by its section on "false advertising":

a representation that furniture is made of mahogany or is solid mahogany when it has only a mahogany finish or a mahogany ve-

neer; or a representation that what is in fact a cotton textile has 40 per cent of wool; or that a coffee drink contains no caffein or tobacco no nicotine; or that the goods were produced in a particular geographical area which adds to their merit, when in fact they were produced elsewhere; or that the goods will perform a specific function when in fact they can do nothing of the sort; or that they were produced according to a particular design when that design was not used at all. Restatement (First) of Torts § 761, comment b.

8. In recent years, "unfair competition" has more and more come to signify a very broad range of practices contrary to "honest dealings." *See* 1 R. Callmann, *supra* note 6, § 4.1. For the purposes of this opinion, however, our continued references to "unfair competition" are meant to be understood as the specific common-law tort discussed in the text.

9. *See* text and note at note 6 *supra*.

We do not, however, write on a clean slate. In *Boston Professional Hockey, supra,* we held that the use of another's unregistered, *i. e.,* common-law, trademark "can constitute a violation of [§ 43(a)] where '. . . the alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a *[false] representation that its goods come from the same source.'"* 510 F.2d at 1010 (emphasis added), *quoting Joshua Meier Co. v. Albany Novelty Manufacturing Co.,* 236 F.2d 144, 147 (2d Cir. 1956). This statement clearly announced this Circuit's view that § 43(a) proscribes not only what had been considered "false advertising" but also what had been differentiated as "unfair competition." That step taken, we see no reason to apply § 43(a) to one form of common-law "unfair competition," namely, trademark infringement, but not to another form of that same tort, *i. e.,* trade dress infringement.

Indeed, another panel of this Court, apparently recognizing the force of this argument, recently expressly allowed a suit for trade dress infringement under § 43(a). *See Sun-Fun Products, Inc. v. Suntan Research & Development, Inc.,* 656 F.2d 186, 192 (5th Cir. 1981). Bound by these precedents, we therefore hold that Ortho's claim of trade dress infringement was rightfully brought under § 43(a) and that § 43(a) created a *sui generis* federal statutory cause of action for "false representation." *See Norman M. Morris Corp. v. Weinstein,* 466 F.2d 137, 141 (5th Cir. 1972). Therefore, common-law decisions interpreting this tort, while suggestive, are not controlling. *Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d 366, 373 (1st Cir. 1980).

### III.

The district court held that, even if § 43(a) were applicable, Ortho would lose because it did not prove either that its trade dress had acquired secondary meaning or that VPG's use of Trade Dresses Nos. 1–4 was likely to cause consumer confusion. We address these points in turn.

Some circuit courts, like the district court, have required secondary meaning. *See, e. g., Vibrant Sales, Inc. v. New Body Boutique, Inc.,* 652 F.2d 299, 303 (2d Cir. 1981); *Keebler Co., supra,* 624 F.2d at 378. We do not agree, however, that secondary meaning must be shown in every trade dress infringement suit.

The term "secondary meaning" was developed as part of the common-law of trademarks. The purpose of a trademark is to enable consumers to distinguish between similar goods or services supplied from different sources. Some words and phrases are patently distinctive and, therefore, qualify facially for legal protection, *e. g.,* coined works like Kodak. However, descriptive terms, geographical place names, and family surnames are not inherently distinctive and do not alone identify any particular company's product. They were not protected as trademarks unless they had acquired distinctiveness through extensive use by a single supplier, so that the public would recognize them as identifying the source of the product. This consumer identification is known as "secondary meaning." Diamond, *Untangling the Confusion in Trademark Terminology,* 78 Pat. & T.M. Rev. 195, 196 (1980). *See also Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73, 78 (1938). Thus, trademark law requires a demonstration of "secondary meaning" only when the claimed trademark is not sufficiently distinctive of itself to identify the producer.

The same principles should apply to protection of trade dresses. If the features of the trade dress sought to be protected are arbitrary and serve no function either to describe the product or assist in its effective packaging, there is no reason to require a plaintiff to show consumer connotations associated with such arbitrarily selected features. As the Second Circuit Court of Appeals explained in *Perfect Fit Industries, Inc. v. Acme Quilting Co.,* 618 F.2d 950, 952–53 (2d Cir. 1980), applying New York law, the number of nonfunctional words and symbols available for use by later comers in the marketing of their products is

unlimited. Similarly, the possible varieties of advertising display and packaging are virtually endless. The principal question, therefore, is whether or not the public is likely to be confused, rather than whether the first comer's trade dress has acquired secondary meaning.

Ortho could not preempt the use of red and yellow nor does it seek to do so. It seeks only to protect the combination of particular hues of these colors, arranged in certain geometric designs, presented in conjunction with a particular style of printing, in such fashion that, taken together, they create a distinctive visual impression. This would leave innumerable other combinations of the same colors or other colors that could be assembled in a multitude of patterns to be used with uncounted type faces. Applying the Lanham Act, therefore, the district court should not have required Ortho to demonstrate that the collection of arbitrary features it assembled had acquired secondary meaning.

The district court also held that Ortho would have to demonstrate a likelihood of confusion as to the source of the products resulting from VPG's use of its trade dresses. With this we agree, for the requirement flows logically from the statutory basis of the action, the making of a "false representation." Indeed, the basic test under every type of "unfair competition" is the "likelihood of confusion" test. *See, e. g., Sun-Fun Products, supra,* 656 F.2d at 192; *Harlequin Enterprises Ltd. v. Gulf & Western Corp.,* 644 F.2d 946, 949 (2d Cir. 1981); *Keebler Co., supra,* 624 F.2d at 377; *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 258 (5th Cir. 1980); *Boston Professional Hockey, supra,* 510 F.2d at 1013.

The district court found that Ortho failed to demonstrate any likelihood of confusion. In this circuit, likelihood of confusion is a finding of fact that can be set aside only if clearly erroneous. *Amstar Corp., supra,* 615 F.2d at 258; Fed.R.Civ.P. 52(a). It is well established, however, that the "clearly erroneous" standard of appellate review is inapplicable when the trial court does not apply governing legal standards in making its findings. *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 384 (5th Cir. 1977). *See also Continental Motors Corp. v. Continental Aviation Corp.,* 375 F.2d 857, 859 (5th Cir. 1967); *Davis v. Parkhill-Goodloe Co.,* 302 F.2d 489, 491 (5th Cir. 1962). Finding that the district court misapplied one crucial legal standard in making its determination as to VPG's Trade Dress No. 1 that no likelihood of confusion existed, we reverse that determination.

As we recently stated in *Sun-Fun Products,* the "central inquiry" in a trade dress infringement suit under § 43(a) is "whether the defendant is passing off his goods . . . as those of the plaintiff by virtue of substantial similarity between the two, leading to confusion on the part of potential customers," and the factors relevant to this inquiry "are essentially the same as those relevant in determining trademark infringement, but the scope of inquiry into similarity of design is considerably broader." *Sun-Fun Products,* 656 F.2d at 192.

Thus, in the trademark area, we have held that the likelihood of consumer confusion is determined by looking at a variety of factors, or "digits," including the defendant's intent, the similarity of design, actual confusion, the similarity of product, the similarity of retail outlets and purchasers, and the similarity of advertising media used. *See Amstar Corp., supra,* 615 F.2d at 259–63. Disposing of the easy points first, Ortho and VPG, both marketers of lawn and garden products, were selling similar products through similar retail outlets to similar purchasers. As regards advertising, both Ortho and VPG products are promoted extensively through point of sale displays. In fact, VPG products are advertised only that way. These factors point to a likelihood of confusion.

We address the remaining "digits" first with regard to Trade Dress No. 1, *see* Diagram 1 *supra,* then with regard to Trade Dresses Nos. 2–4, *see* Diagram 2 *supra.*

*Intent:* we stated in *Amstar* that the "intent of defendants in adopting [their

mark] is a critical factor, since if the mark was adopted with the intent of deriving benefit from the reputation of [the plaintiff,] *that fact alone may be sufficient to justify the inference that there is confusing similarity.*" *Amstar Corp., supra*, 615 F.2d at 263 (emphasis added). "[A]s soon as we see that a second comer in a market has, for no reason that he can assign, plagiarized the 'make-up' of an earlier comer, we need no more; for he at any rate thinks that any differentia he adds will not, or at least may not, prevent the diversion and we are content to accept his forecast that he is 'likely' to succeed." *American Chicle Co. v. Topps Chewing Gum, Inc.*, 208 F.2d 560, 563 (2d Cir. 1953) (L. Hand, J.).

As we have noted, the district court found that VPG, in designing Trade Dress No. 1, meant to copy Ortho's trade dress, at least "as much as the law would allow." While the district court did not specifically find that VPG copied Ortho's trade dress with the intent of "cashing in" on Ortho's goodwill, we can think of no other plausible explanation for such behavior. It is so easy for a business man who wishes to sell his goods upon their merits to select marks and packagings that cannot possibly be confused with his competitor's that "courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them." *Florence Manufacturing Co. v. J. C. Dowd & Co.*, 178 F. 73, 75 (2d Cir. 1910).

*Similarity of design*: the district court found that Ortho's trade dress and VPG's Trade Dress No. 1 were similar enough that a consumer might "initially" confuse them, but that any such confusion "would be dispelled upon a close examination and comparison." The judge stated that, "Because these products are frequently toxic, and because the consumer must read the label to see if a specific product is what he or she needs, the consumers of lawn and garden products can be expected to exercise a higher degree of care in selecting [these] products than they would for the average shelf item."

This conclusion is not supported by any evidence in the record. Even if the statement correctly describes the behavior of first time purchasers, there is neither evidence for, nor does logic support, the proposition that a consumer buying "bone meal" for the tenth time rereads the entire label. Moreover, even those who read the label to see if the product does what the buyer wants it to do, or to determine its toxic properties, do not necessarily have their attention directed to information regarding the product's manufacturer.

Even if close examination would differentiate the products, that is not sufficient to dispel the initial confusing similarity. "The touchstone under § [43(a)] is . . . similarity in the *overall trade dress of the products.*" *Sun-Fun Products, supra*, 656 F.2d at 192 (emphasis added). *See also Perfect Fit, supra*, 618 F.2d at 955 ("[I]t is the 'combination of features as a whole rather than a difference in some of the details which must determine whether the competing product is likely to cause confusion in the mind of the public,'" *quoting Pharmaceuticals, Inc. v. United Whelan Corp.*, 22 Misc.2d 532, 534–35, 197 N.Y.S.2d 22, 25 (Sup.Ct.1959)). It was error to determine dissimilarity on the basis of a "close examination and comparison" in the face of close overall similarity. *Accord, RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir. 1979).

*Consumer confusion*: the district court found persuasive the fact that Ortho produced no evidence of actual consumer confusion. As we have stated, this is patently the best evidence of likelihood of confusion. *See, e. g., Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 45–46 (5th Cir. 1975); *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971). However, the absence of such evidence does not necessarily demonstrate the converse. *Cf. Scarves by Vera, Inc. v. Todo Imports, Ltd.*, 544 F.2d 1167, 1175 (2d Cir. 1976); *W. E. Basset Co. v. Revlon, Inc.*, 435 F.2d 656, 662 (2d Cir. 1970). It would be exceedingly difficult to detect instances of actual confusion when, as here, the goods are relatively inexpensive and their actual properties are exactly identical; *e. g.*, Ortho's Malathion is

the same as VPG's.[10] In sum, it seems to us that the lack of evidence of actual confusion did not militate strongly against a finding of likelihood of confusion.

Reviewing the digits, then, with regard to Trade Dress No. 1, we find that they all, with the exception of evidence of actual confusion, support a finding of likelihood of confusion. We, therefore, reverse the district court's finding of no likelihood of confusion, and thus, its judgment in favor of VPG on Ortho's § 43(a) claim. Ortho is entitled to effective injunctive relief, the proper scope of which will be discussed *infra.*

As to VPG's Trade Dresses Nos. 2–4, the district court found that their "*overall appearance ... to the ordinary consumer, even to an inattentive person not exercising reasonable care, would not be confusing when compared to Ortho's trade dress ....* [T]hese trade dresses [are] not confusingly similar, and even dissimilar*" (emphasis added). Because the court thus applied the governing legal standard of "overall appearance," and we cannot conclude that its findings relating to Trade Dresses Nos. 2–4 are clearly erroneous, we affirm its judgment that VPG's use of these later trade dresses did not constitute independent violations of § 43(a).

Having thus determined that Ortho proved its claim under § 43(a) with regard to VPG's Trade Dress No. 1, we remand to the district court for the entrance of an appropriate injunctive order. Such an order will prohibit VPG from using Trade Dress No. 1 or any other trade dress confusingly similar to Ortho's. Although we have just determined that VPG's Trade Dresses Nos. 2–4, standing alone, did not constitute violations of § 43(a), that does not mean that the injunction we direct the district court to issue must allow them to be used. [A] competitive business, once convicted of unfair competition in a given particular, should thereafter be required to keep a safe distance away from the margin line—even if that requirement involves a handicap as compared with those who have not disqualified themselves.

*Broderick & Bascom Rope Co. v. Manoff,* 41 F.2d 353, 354 (6th Cir. 1930). In a similar case, *Kimberly Knitwear, Inc. v. Kimberley Stores Inc.,* 331 F.Supp. 1339 (W.D.Mich. 1971), the plaintiff was a manufacturer of women's apparel sold under the trademark "Kimberly." Defendants sold women's apparel and named their stores "Kimberley's." During the pendency of the action, defendants changed their name to "Kimley's" which they argued they were entitled to use thereafter. The court rejected the argument:

It appears, however, that defendants have attempted to retain the goodwill they have appropriated by the use of plaintiff's name, through the use of a name which, while perhaps not confusingly similar, is so reminiscent of the plaintiff's that it continues to accord the defendants some of the same unfair advantage they have previously enjoyed. This they may not do.

331 F.Supp. at 1341.

We ourselves have recently reaffirmed these principles in an unfair competition case:

An injunction can be therapeutic as well as protective. In fashioning relief against a party who has transgressed the governing legal standards, a court of equity is free to proscribe activities that, standing alone, would have been unassailable. *See, e. g., United States v. Loew's, Inc.,* 371 U.S. 38, 53, 83 S.Ct. 97, [106,] 9 L.Ed.2d 11 (1962) (collecting cases). The sweep of equitable discretion is at least this broad.

*Kentucky Fried Chicken, supra,* 549 F.2d at 390. The district court should, therefore, in fashioning the injunction mandated by this opinion, state that it will construe the phrase "confusingly similar" broadly so as to prohibit the use, not only of Trade Dress No. 1, but also efforts by VPG to retain at

---

**10.** There was some evidence of actual confusion by retail clerks but not by consumers. The district court found: "There have been instances where [VPG] and Ortho packages were mixed together on shelves, but the court had no evidence to show that this mixing was other than inadvertent."

least part of the goodwill originally misappropriated from Ortho.

## IV.

Ortho's state law claims need not detain us long. As the district court noted, the Texas law of unfair competition, like that under § 43(a) of the Lanham Act, also requires a showing of "likelihood of confusion." *See, e. g., Miller v. Lone Star Tavern, Inc.,* 593 S.W.2d 341, 344 (Tex.Civ.App. —Waco 1979, no writ). Therefore, regardless of other Texas requirements, Ortho's success under its state law claim could be no greater than we have determined that it was under § 43(a). Thus, the injunction which we order to be entered against VPG as a result of its violation of § 43(a) will be at least as broad as any that could be justified under Texas law. We, therefore, need not consider the issues of whether, on the facts of this case, Texas law required Ortho to demonstrate secondary meaning, as held by the district court, or, if so, whether, contrary to the finding of the court below, Ortho demonstrated such secondary meaning.

REVERSED and REMANDED.