**FREDDIE FUDDRUCKERS, INC., Plaintiff,**

v.

**RIDGELINE, INC., d/b/a Purdy's Hamburger Market and Bakery, Defendant.**

No. CA–3–83–1128–D.

United States District Court, N.D. Texas, Dallas Division.

Feb. 15, 1984.

As Amended April 5, 1984.

Richard L. Schwartz, Houston, Tex., Charles S. Cotropia, Dallas, Tex., for plaintiff.

Kenneth Glaser, Dallas, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROBERT M. HILL, District Judge.

Freddie Fuddruckers, Inc., (Fuddruckers) seeks a preliminary injunction against Ridgeline, Inc., (Ridgeline) d/b/a Purdy's Hamburger Market and Bakery (Purdy's) to prevent Purdy's from using the trade dress which Fuddruckers uses in association with its restaurant business. Hearings were held before the Court on January 6 and January 26, 1984. Having reviewed the evidence introduced at the hearings, along with the parties' arguments and briefs, the Court is of the opinion that a preliminary injunction should issue. In support of its grant of a preliminary injunction, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Fuddruckers is a Texas corporation having its principal place of business in San Antonio, Texas; its stock is publicly traded. Purdy's is a Texas corporation having its principal place of business in Addison, Texas.

2. Both Fuddruckers and Purdy's are engaged in the restaurant business and specialize in selling hamburgers.

3. Fuddruckers was incorporated on or about March 10, 1979, and opened its first restaurant under the name Fuddruckers in San Antonio, Texas, in March 1980. At the time of the hearing Fuddruckers had opened a total of fifteen restaurants, three of which are franchise arrangements.

4. The design of all franchises is controlled by Fuddruckers. A franchise must obtain approval for any changes in design. *See* Plaintiff's Exhibit Number 3.

5. Fuddruckers is in the process of expanding the number of its restaurants and it has undertaken a franchise program. It has entered into a franchise agreement with Prufrock Ltd., Inc., for a restaurant in Dallas, Texas, to be opened on or about

March 1984. Fuddruckers has also scheduled the opening of four other locations.

6. Ridgeline was incorporated on July 8, 1982. Ridgeline opened its first restaurant under the name Purdy's on June 12, 1983, in Addison, Texas, a suburb of Dallas.

7. On January 4, 1984, a second Purdy's was opened in Austin, Texas; it is located a short distance from the Austin Fuddruckers location.

8. At the time the Purdy's in Addison was opened, Fuddruckers had four locations operating. They were located in San Antonio (Botts Lane), Houston (Chimney Rock), San Antonio (Wurzbach) and Austin.

9. Leases have been executed by Ridgeline for Purdy's locations in Houston and Irving, Texas. Other Texas locations are also being considered. *See* Plaintiff's Exhibit Number 25.

10. Fuddruckers features the following items in its restaurants, which constitute, *inter alia,* its "trade dress": an exposed glassed-in butcher shop for meat preparation, which includes an area for hanging beef and for cutting and processing beef; a beef showcase; an exposed on-premises bakery for the preparation of bread and dessert products; a bakery showcase for the bakery products; a fresh vegetable condiment island with stacked vegetables, in part, in original shipping cartons; an open display of bags of potatoes, onions, flour and sugar; cases of beverages stacked to form aisleways and tables; the extensive use of white tile on counters and walls; dark brown and white checkerboard asbestos tile flooring; and interior green bands of neon lights and neon beer signs.

11. Purdy's features the following items in its restaurants: an exposed glassed-in butcher shop for meat preparation, which includes an area for hanging beef and for cutting and processing beef; an exposed on premises bakery for the preparation of bread and dessert products; a bakery showcase for bakery products; a fresh condiment island with stacked vegetables; an open display of bags of potatoes, onions, flour and sugar; stacked cases of beverages; the extensive use of white tile on counters and walls, interspersed at points with black tiles, black and white checkerboard flooring; interior green bands of neon light and neon beer signs.

12. The President and owner of Purdy's, Ralph McElroy (McElroy), visited the Botts Lane San Antonio Fuddruckers location in May 1982 with Allen Reich (Reich), the Vice-President/architect for Purdy's. McElroy again visited that location, as well as the Houston Fuddruckers location, in the summer of 1982 with his wife. In July 1982 McElroy decided to open a hamburger restaurant.

13. In the fall of 1982 Reich and McElroy again visited the Botts Lane San Antonio Fuddruckers. McElroy revisited that location a short time later with Donnie Marzluff (Marzluff), Purdy's manager of operations.

14. In December 1982 the Addison lease was negotiated by Purdy's. In March 1983 Reich prepared the floor plans for Purdy's. *See* Plaintiff Exhibits Numbers 20–22.

15. Construction began on Purdy's Addison location on April 19, 1983. In April 1983 McElroy, Reich, Marzluff and Mike Dobbins (Dobbins), the first manager for Purdy's, visited the Wurzbach Lane San Antonio and the Chimney Rock Houston Fuddruckers.

16. McElroy and his wife were responsible for the interior design of Purdy's. They received suggestions as to the interior design from Reich, Marzluff and Dobbins.

17. Fuddruckers was an important influence on McElroy's decision to open Purdy's. In the interior design of Purdy's McElroy sought to imitate the interior design of Fuddruckers in order to derive benefit from the reputation of Fuddruckers.

18. The design of the two restaurants is very similar. Key features in both restaurants are the same: the use of white/light color tiles as opposed to plain walls; the location and use of an open bakery showcase and exposed bakery area; an exposed butcher shop with hanging beef and visible

preparation area; condiment islands which resemble grocery store vegetable departments; checkerboard floors; displays of groceries and beverages in their original packaging, and neon signage.

19. The purchasers of the parties' services are similar: young families who seek a nicer atmosphere than a fast food restaurant, as well as other consumers seeking to escape the fast food milieu.

20. Fuddruckers' advertising has consisted of paid magazine advertisements and articles written about Fuddruckers in various magazines and newspapers. *See* Plaintiff's Exhibits Numbers 5–12. The interior of Fuddruckers has been shown on television. Fuddruckers has contracted for a television advertising campaign.

21. Purdy's advertising has consisted of fliers, uniforms and stickers exhibiting its logo. Print media and radio advertising are being considered.

22. Both McElroy and Fuddruckers' President, Philip J. Romano (Romano), agree that the use of white tiles, open food preparation areas and visible ingredients is to produce an ambiance of freshness and unadulteratedness and to permit customers to see the quality of the ingredients used in the food served. These design features are related to the utilitarian function of the restaurant service which is to provide fresh food in clean surroundings, and they have led to the commercial success of these restaurants. However, it is the combination of the items listed in Finding of Fact No. 10, into an overall design or trade dress, which makes Fuddruckers unique and distinguishable from other restaurants which have, for example, a bakery display or a meat showcase. The overall design of Fuddruckers is arbitrary and non-functional.

23. Customer survey cards exhibit consumer confusion on the part of two individuals as to the relationship of Purdy's and Fuddruckers. *See* Plaintiff's Exhibit Numbers 26A and 26B; Defendant's Exhibit Number 20. Romano testified to statements by the public made of confusion as to the ownership of Purdy's by Fuddruck-ers, as did Fuddruckers' Dallas franchiser, Gene Street.

24. The overall design or impression of Fuddruckers has become identified in the mind of the public with Fuddruckers. The newspaper articles and television exposure are evidence of public recognition of the unique ambiance of Fuddruckers.

25. Fuddruckers is harmed by trade dress infringement to the extent that customers are confused as to the source of the services of Purdy's, its ability to expand its operation is hampered, and investment in its publicly traded stock may be negatively affected due to duplicability.

26. Purdy's interior design infringes on the trade dress of Fuddruckers.

27. Purdy's can alter its interior features which are similar to Fuddruckers, *see* finding of fact 18, in a limited manner to clearly distinguish itself from Fuddruckers' trade dress at a minimal cost and with minimal inconvenience to its operation and consumers.

### Conclusions of Law

1. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1338 and 15 U.S.C. § 1121; venue is proper in the Northern District of Texas, Dallas Division, pursuant to 28 U.S.C. § 1391. The Court has jurisdiction over the related common law claims pursuant to pendent jurisdiction.

2. Fuddruckers asserts claims for trade dress infringement in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and common law unfair competition.

3. Trade dress is defined as the "total image" of a product, this may include features such as size, shape, color or color combination, texture, graphics, sales techniques, and lay-out of a floor plan. *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir.1983); *Original Appalachian Artworks, Inc. v. Toy Loft*, 684 F.2d 821, 830–832 (11th Cir. 1982); *Associated Hosts of California, Inc. v. Moss*, 207 U.S.P.Q. 973, 975 (W.D.N. C.1979).

4. The central inquiry in an action of this kind is "whether the defendant is passing off his goods or services as those of the plaintiff by virtue of the substantial similarity between the two, leading to confusion on the part of potential customers." *Sun-Fun Products, Inc. v. Suntan Research & Development Inc.*, 656 F.2d 186, 192 (5th Cir.1981), *quoting Boston Professional Hockey Assoc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1010 (5th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 312 (1975).

5. The essential element of an action for trade dress infringement and unfair competition is proof by the plaintiff that the alleged infringement creates a likelihood of confusion on the part of ordinary consumers as to the source of the goods. *Original Appalachian*, 684 F.2d at 831; *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 703 (5th Cir.1981), *cert. denied*, 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982). A variety of factors are considered in determining the likelihood of confusion, including the similarity of the products, the similarity of purchasers, the similarity of advertising media used, the similarity of design, the defendant's intent and actual confusion. *Chevron Chemical*, 659 F.2d at 703; *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 259 (5th Cir.1980), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1981).

6. Hearsay letters and statements of customers are admissible in evidence under Fed.R.Evid.Rule 803(3) where they reveal the then existing state of mind of the writers and speakers and their state of mind is relevant to the case. *Morris Jewelers v. General Elec. Credit Corp.*, 714 F.2d 32 (5th Cir.1983). (Finding that anger of customers translated into the loss of good will.) Evidence consisting of the customer survey cards and statements by the public demonstrated customers' confused state of mind as to the services rendered by Fuddruckers and Purdy's.

7. If a trade dress is adopted by a defendant with the intent of deriving benefit from the reputation of the plaintiff that fact alone may be sufficient to support the inference that there is a likelihood of confusion. *John H. Harland Co.*, 711 F.2d at 977; *Chevron Chemical*, 659 F.2d at 704. As the Fifth Circuit stated:

> It is so easy for a businessman who wishes to sell his goods upon their merits to select marks and packaging that cannot possibly be confused with his competitor's that "courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them."

*Chevron Chemical, supra, quoting Florence Mfg. Co. v. J.C. Dowd & Co.*, 178 F. 73, 75 (2nd Cir.1910), *as quoted in Original Appalachian*, 684 F.2d at 832. The adoption by Purdy's of the interior design of Fuddruckers with the intent to derive benefit from the reputation of Fuddruckers supports a finding of a likelihood of confusion to the public.

8. Similarity of design stems from an overall impression conveyed by the trade dress, rather than from a comparison of individual features of the products. *Chevron Chemical*, 659 F.2d at 204; *Sun Fun Products*, 656 F.2d at 189. The individual features as well as the overall design of Fuddruckers and Purdy's restaurants demonstrates a clear similarity between them and a likelihood of confusion to the public.

9. Evidence of actual confusion by a potential customer is "patently the best evidence of likelihood of confusion." *Chevron Chemical*, 659 F.2d at 704. *See also Original Appalachian*, 684 F.2d at 832.

10. The presence of a likelihood of confusion is a question of fact. *Supreme Assembly, Order of Rainbow For Girls v. J.H. Ray Jewelry Co.*, 676 F.2d 1079, 1082 (5th Cir.1982). The finding of confusion is supported by the evidence. Fuddruckers and Purdy's are selling similar services to similar customers in proximate market areas. The advertising of the products do not have identity because Purdy's has not

yet begun to use the media. However, the design of the two restaurants is very similar and there is evidence of actual confusion. The high degree of similarity of trade dress and the repeated trips by McElroy to view Fuddruckers establishments before and while designing Purdy's requires the Court to conclude that there is a likelihood of consumer confusion.

■ 11. The doctrine of functionality is basically an attempt to distinguish between design features of a product which serve a useful purpose in the functioning of the product and those that are merely arbitrary. *Supreme Assembly*, 676 F.2d at 1083 n. 5. The effect of this doctrine is to allow the public interest in being able to purchase competing items to override the producer's right to protect the goodwill its product has generated. Litman, *The Problem of Functional Features: Trade Dress Infringement Under Section 43(a) of the Lanham Act*, 82 Colum.L.Rev. 77, 80 n. 27 (1982). The policy predicate for the functionality doctrine stems from the public interest in enhancing competition. *Keene Corp. v. Paraflex Industries, Inc.*, 653 F.2d 822, 827 (3d Cir.1981).

12. Functionality has been defined in a number of ways. *Id.* at 825; *see* Litman, 82 Colum.L.Rev. 77. In *Keene, supra,* the Third Circuit held that when a design feature is intricately related to the utilitarian function of the product, the Court may not grant a perpetual monopoly despite the fact that the design feature also has aesthetic qualities. *Keene,* 653 F.2d 825–26. However, where the design itself is not significantly related to the utilitarian function of the product, but is merely arbitrary, the product is entitled to protection. *Id.* at 825. This is more narrow than the test applied in the Ninth Circuit, which has held a design to be functional "[i]f the particular feature is an important ingredient in the commercial success of the product," or the aesthetic appeal was an essential selling feature. *Pagliero v. Wallace China Co.,* 198 F.2d 339, 343 (9th Cir.1952). *Accord, Vuitton et Fils S.A. v. J. Young Enterprises, Inc.,* 644 F.2d 769 (9th Cir.1981);

*Ives Laboratories, Inc. v. Darby Drug Co.,* 601 F.2d 631, 642–43 (2d Cir.1979). A test based on cases decided by the Court of Customs and Patent Appeals has been proposed which would focus on the functionality of the configuration as a whole and the effects on competition of protecting a design feature. Litman, 82 Colum.L.Rev. at 96. To the extent packaging is not utilitarian, "it represents a sales technique designed to make the product readily identifiable to consumers and unique in the market place." *Original Appalachian,* 684 F.2d at 831.

13. Under both the narrow Third Circuit test and the broader Ninth Circuit test, the individual features included in Fuddruckers' trade dress have the utilitarian function of presenting the freshness and quality of the food being served and cleanliness in its preparation. As the parties are involved in the restaurant business, it would be inapt to say that the interior design features of their establishments are not related to the function of food service. The overall design or trade dress of the restaurant, as opposed to the individual features, however, is arbitrary.

■ 14. If the overall design or trade dress of an item is nonfunctional, proof of secondary meaning is necessary in order to obtain protection. *See Warehouse Restaurant v. Customs House Restaurant,* 217 U.S.P.Q. 411, 418 (N.D.Cal.1982); J. McCarthy, *Trademark and Unfair Competition* § 8.2 (1973). To establish secondary meaning, a plaintiff must show that in the minds of the public the primary significance of the trade dress is to identify and individualize the source of the service rather than the service itself. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, n. 11, 102 S.Ct. 2182, n. 11, 72 L.Ed.2d 606 (1982). *See Warehouse Restaurant, supra.* Stated differently, a plaintiff must establish that consumers purchase the service because the presence of the trade dress indicates to them a connection between the service itself and the plaintiff. *Chevron Chemical,* 659 F.2d at 702.

78

15. Secondary meaning has attached to Fuddruckers' trade dress, such that consumers identify the design of the product with Fuddruckers. The notoriety exists both in the Austin and the Dallas area, as evidenced by the circumstantial evidence of the regional magazine and television coverage, as well as the ability of Fuddruckers to successfully expand and franchise. This finding of secondary meaning gives rise to entitlement to some remedy to prevent confusion and palming off amounting to unfair competition. *Cf. Keene*, 653 F.2d at 827; Lifman 82 Colum. L.Rev. at 91, 97.

16. Fuddruckers has shown that irreparable harm may result to it from Purdy's use of the trade dress.

17. Fuddruckers has demonstrated a substantial likelihood of success on the merits as to trade dress infringement and unfair competition.

18. Fuddruckers has shown that any harm it will suffer as a result of the denial of injunctive relief will outweigh any hardship Purdy's will suffer by being restrained.

19. It is in the public interest to avoid consumer confusion and the public interest would be served by the issuance of a preliminary injunction.

20. Any finding of fact determined to be a conclusion of law is so deemed, and any conclusion of law determined to be a finding of fact is so deemed.

It is so **ORDERED.**