**CFM MAJESTIC, INC., Plaintiff,**

v.

**NHC, INC., Defendant.**

**No. Civ. 1:99–CV–120.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

March 15, 2000.

Thomas A. Herr, Barrett and McNagny, Fort Wayne, IN, Michael H. Baniak, Jeffrey A. Pine, Christina L Brown, Baniak Nicholas Pine and Gannon, Evanston, IL, for CFM Majestic, Inc., Plaintiff.

Stephen J. Weyer, Randall J. Knuth PC, Robert S. DiPalma, David Borsykowsky, Paul Frank & Collins Inc, Burlington, VT, Randall J. Knuth, Fort Wayne, IN, for NHC INC, a Vermont Corporation, Defendant.

## FINDINGS OF FACT AND CONCLUSION OF LAW

COSBEY, United States Magistrate Judge.

### I. INTRODUCTION

This is an action brought by CFM Majestic, Inc. ("CFM") for infringement of CFM's federally registered trademark, VERMONT CASTINGS ("VERMONT CASTINGS"), under Section 32 of the Lanham Act, 15 U.S.C. § 1114, Unfair Competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and state and common law unfair competition, by reason of NHC, Inc.'s ("NHC") use in commerce of the name "VermontHearth."

This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331; 15 U.S.C. § 1121, 28 U.S.C. § 1338(a) and (b); and pursuant to the principles of supplemental jurisdiction under 28 U.S.C. § 1367. The parties concede that venue is proper in this district pursuant to 28 U.S.C. § 1391.

At issue in this case is whether NHC has violated either federal trademark, or federal or state unfair competition law by using the name VermontHearth to identify

a new line of cast-iron stoves that it has recently introduced into the market.

Originally set for a preliminary injunction hearing in December 1999, by agreement of counsel the June 20, 2000 trial date was advanced on the calendar so that the matter could also be heard on the merits at the earliest possible date. Thus, the case was ultimately tried to the Court[1] on January 27 and 28, 2000. The Plaintiff was present by counsel, Michael H. Baniak, Jeffrey A. Pine and Christina L. Brown. The Defendant was present by counsel, Robert S. DiPalma and David Borsykowsky. The Court has considered the testimony of the in-court witnesses, the deposition testimony that was offered, and the exhibits introduced into evidence. (Hereinafter, "Plnf.Exh.____"; or "Def. Exh____"). A two volume transcript of the trial proceedings has been prepared and filed. (Hereinafter, "Tr.____" or "Tr. II ____.")

At the close of the Plaintiff's case in chief and again at the close of all of the evidence, the Defendant orally moved for the entry of a judgment in its favor pursuant to Fed.R.Civ.P. 52(c). The Court took those motions under advisement. At the close of all the evidence the Court directed counsel to submit proposed Findings of Fact and Conclusions of Law and established a schedule for post-trial briefing. Proposed Findings of Fact and Conclusions of Law, and all post-trial briefing have now been submitted.

Following these extensive submissions, on March 7, 2000, CFM filed a motion seeking to reopen the proceedings based upon new evidence. As discussed more fully *infra*, that motion will be denied.

Having considered the arguments and the evidence submitted, the Court makes its Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a) and Fed.R.Civ.P. 65 based upon a preponderance of the evidence.

## II. FINDINGS OF FACT[2]

There are those who would say that the story of Vermont Castings is almost uniquely American. In 1973, a young Duncan Syme was frustrated that he could not find a high-quality, well-designed wood stove for a home he had built, so he decided to build one. (Tr. 43, 46). Shortly thereafter, in 1975, Syme and his brother-in-law began selling those wood stoves under the name VERMONT CASTINGS ("VERMONT CASTINGS"). (Tr. 55). From such humble beginnings, both Vermont Castings, Inc. ("Vermont Castings"), and indeed, an entire industry arose.

Vermont Castings, which started as a consumer-direct company (Tr. 28), soon became identified by the public as the manufacturer of reliable, high-quality, wood and coal-burning stoves. (Tr. 135). The rise of the company, initially fueled in some measure by the fortuitously coincident "energy shortage" of the 1970's, soon came to the attention of the media.[3] Early on, Vermont Castings acquired an excel-

1. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

2. So as to comply with Fed.R.Civ.P. 52(a) the Court makes the following Findings of Fact which will be set out in narrative fashion. Any Finding of Fact deemed to be a Conclusion of Law is hereby incorporated as such and any Conclusion of Law deemed to be a Finding of Fact is hereby incorporated as such.

3. For a sampling, *see, e.g.,* "Spontaneous Combustion," *Inc.,* April 1983 (Plnf.Exh. 36); "America's Burning Passion," *Express,* Janu-

ary 1982 (Plnf.Exh. 54); "The Cooling of America," *Time,* December 24, 1979 (Plnf.Exh. 55); "Love Among the Wood Stoves," *New England Monthly,* October 1984 (Plnf.Exh. 56); "The Return of Firelight," *Yankee,* January 1984 (Plnf.Exh. 57); "Vermont Castings," *Solid Fuel,* June 1983 (Plnf. Exh 58); "Hottest Stoves in America," *Quest,* December 1980 (Plnf.Exh. 59); "99 Things That, Yes, Americans Make Best," *Money,* May· 1987 (Plnf.Exh. 83); "Best Buys in Wood Stoves & Gas Fireplaces," *Consumers Digest,* November/December 1999 (Plnf.Exh. 74). The company used this media interest as part of its marketing. (Tr. 44–52, 87).

lent national and international reputation for high-quality hearth products, including stove attachments and accessories. Indeed, since the mid-seventies, Vermont Castings has been a recognized industry leader and innovator, sparking the development of a multi-million dollar stove industry. (Tr. 146).

Vermont Castings holds two incontestible federal trademark registrations relating to its VERMONT CASTINGS mark:

(a) Registration No. 1,252,241 for the mark VERMONT CASTINGS issued September 27, 1983, for the identification of wood and coal burning stoves; stove parts; stove attachments and accessories in U.S. Class 34;

(b) Registration No. 1,323,976 for the mark VERMONT CASTINGS issued March 12, 1985, for the identification of high temperature paint for stoves, metal snips, splitting malls, axes, ash shovels, stove gloves, heat shields, safety guard screens, coat hooks, benches, trivets, portable ash containers, canvas log carriers, T-shirts, belt buckles, hearth rugs and coin banks in U.S. Class 2, 13, 16, 22, 23, 26, 29, 32, 39, 40, 42 and 50.

(See Plaintiff's Exhibits 1 and 2; Tr. 60). Over the last twenty-four years, the VERMONT CASTINGS trademark has become exclusively identified with all Vermont Casting products including wood, coal, and gas-burning stoves (the latter line added in 1991) as well as stove attachments and accessories.

The company continues to enjoy an excellent reputation (Tr. 133), has been featured on television shows, (see, Plnf. Exh. 63; Tr. 61) numerous magazine articles (see, n. 3, supra), and on various forms of marketing and promotional items (see Plnf. Exhs. 15, 41–48, 50–51, 72–73, 75–82), which are sometimes sent by direct mail, or placed within the national print media.

(Tr. 69–78). Vermont Castings also has an Internet website with a full product catalog, and does national seasonal television advertising, most recently on the Weather Channel. (Tr. 78). Of course, the company's marketing staff also attend four or five trade shows annually. (Tr. 79). In general, these promotional efforts have been effective in producing customer "leads." (Tr. 133–34, 138).

In the recent past, both Vermont Castings and CFM have annually expended between $900,000 and $1,500,000 advertising the VERMONT CASTINGS trademark directly to the ultimate end-user. (Tr. 79). Additional advertising featuring the trademark also has been directed towards hearth product dealers, so on average, $3,000,000 to $3,500,000 is spent each year promoting the VERMONT CASTINGS trademark. (Tr. 80).[4]

All of this is necessary because the hearth industry has become competitive. (Tr. 141). One of Vermont Castings competitors is NHC's "HearthStone Quality Home Heating Products, Inc." ("HearthStone"), a Vermont company with its principal place of business in Morrisville, Vermont. While HearthStone is considerably smaller, as discussed more fully infra, both companies market their stoves the same way, often through the same dealers, and always to the same potential purchasers. (Tr. 140; Tr. II 28, 90–91).

In 1996, CFM[5] was interested in expanding into the retail business in the United States, so it purchased Vermont Castings, including its trademark, for over $48,000,000.00. (Tr. 41). Indeed, obtaining the VERMONT CASTINGS trademark, and the company's associated goodwill, was a major factor to CFM because not only was it buying instant consumer name recognition, but it also immediately

---

4. This figure does not include the substantial advertising done by local Vermont Castings dealers who also use the trademark. (Tr. 136.)

5. CFM is a corporation organized and existing under the laws of the Province of Ontario, Canada. CFM's wholly-owned subsidiary, The Majestic Products Company, has its principal place of business in this district.

inherited the company's high esteem. (Tr. 104, 122, 228–30). Nevertheless, in part to grow the brand, CFM has increased the name's recognition by adding more products under the VERMONT CASTINGS name, such as barbeques, outdoor furniture, and space heaters. (Tr. 251).

There is keen competition in the industry for dealer sales, with both Vermont Castings and HearthStone attending national shows and publishing in trade publications. (*See, e.g.*, Plnf. Exh. 29). Those dealers are generally specialty retailers who sell multiple brands of hearth products and often other seasonal items, like spas and casual furniture. (Tr. 79–82). The stove customers who visit are sometimes interested in energy independence, and sometimes they are just interested in making a design statement for their home (Tr. 85), but no matter what the reason, they often have no expertise when it comes to stove purchasing. (Tr. 161–69).

Consequently, while the extensive advertising of Vermont Castings' might generate consumer interest, once those consumers arrive at the dealer's showroom it becomes "open season" for their business. (Tr. 84–86). Indeed, it is entirely possible that the dealer does not even carry the Vermont Castings line. However, even if Vermont Castings stoves are in the showroom, the dealer or his salespersons might seek to steer the unwitting customer to a another line either because of existing inventory, sales incentives, or product knowledge. (Tr. 86, 100). This can be done with relative ease because both product appearance and placement is fairly close, even before the introduction of any confusingly-similar names. (Tr. 93–6; 102–3; 165–69). The danger here to the stove manufacturer is significant given that once a stove sale is made, there is not likely to be a second chance considering the products' long life. (Tr. 134–35).

HearthStone started in the mid–70's, but stopped doing business in 1988. (Tr. 198). By 1991 the company was again doing business, but was essentially bankrupt and its reputation was in shambles. (Tr. II 18–19). However, since 1991 the company has experienced something of a rebound, and last year sold about 12,000 stoves.[6] (Tr. II 20). HearthStone manufactures a variety of stove products which, like Vermont Castings are offered at the high-end of the stove market.[7] (Tr. II 28). Until approximately March 1999, HearthStone's line consisted exclusively of cast-iron soapstone stoves.[8] However, Manuel Perez ("Perez"), President of HearthStone since 1991, decided that NHC should seek to penetrate the all cast-iron wood and gas stove market which had previously been occupied by Vermont Castings and a few others.[9] Of course, Perez was well aware of the VERMONT CASTINGS name and mark, probably having first learned of it when he got into the hearth products business by joining HearthStone in 1991.[10] (Tr. 205–06). Nevertheless, Perez decided that since HearthStone was now going to roll out an all cast-iron line of stoves, he wanted the line to have an entirely new name that was linked to "Vermont," ostensibly because HearthStone is a Vermont company, and people associate quality with the State of Vermont.

---

**6.** In stark contrast, Vermont Castings sold about 65,000 stoves in 1999. (Tr. 236).

**7.** Both the Vermont Castings and Hearth-Stone stoves are expensive, and depending on the model, generally cost between $800 to $2,200. (Tr. 83; Tr. II 91).

**8.** The soapstone inserts on the sides, top and front of the cast-iron frame are both aesthetic and heat retentive.

**9.** For example, Jotul, DOVRE, Lopi and Waterford have all been described as competitors in that market. (Tr. 82).

**10.** No other hearth manufacturer uses the name Vermont in connection with the sale of stoves or fireplaces. (Tr. 147, 231). While apparently there was one small regional manufacturer approximately 15–20 years ago, that entity is no longer in existence. (*See,* Keller dep.at p. 8)

However, Perez's testimony on this and other points is not credible.[11] First, it is difficult to believe that a company which a mere eight years ago was virtually out of business, and which has now supposedly reestablished a favorable reputation, would actively pursue a new name, disconnecting from the goodwill associated with Hearth-Stone. (Tr. 213–14). Indeed, Perez's rationale on all this is somewhat difficult to reconcile. He first claims that dealers were complaining because there were too many brands, and that they wanted to simplify, so his marketing strategy was to offer them a full range of stoves under one brand name. (Tr. II, 29– 31). However, he almost immediately turned this notion on its head by claiming that the reason he wanted a new trade name for his cast-iron stoves was because if he used the Hearth-Stone name, sales might not increase because dealers actually allocate their business to a number of different companies, so he wanted to be free to seek another dealer in the vicinity. (Tr. II, 41). On the whole, his testimony appears to be a *post hoc* justification.

Perez's testimony particularly lacks credibility when he tries to describe why he settled on a name that included the word "Vermont"; that is, NHC supposedly chose VermontHearth because Hearth-Stone is a Vermont company, they like Vermont, and there is a connotation of quality and craftsmanship associated with the state.[12] (Tr. II 42, 107). Of course, HearthStone never felt compelled, or even very much interested in using the name before, and if "Vermont" has in fact become synonymous with quality stove craftsmanship, it is because Vermont Castings developed that identity and reputa-

tion. (Tr. 54, 234–5). Rather disingenuously, Perez deems it all a "coincidence" that his new cast-iron line of stoves, like the Vermont Castings cast-iron stoves, are named "Vermont." (Tr. 213).

Moreover, Perez's description of how the name VermontHearth [13] came to be is also unconvincing, and suggests that Hearth-Stone was actually trying to trade on the well-known Vermont Castings mark by coming as close as possible to the name. Perez first claims that he submitted to attorney Stephanie Mapes ("Mapes") a list of prospective "VERMONT" names and she responded with an opinion about them on July 29, 1997. (*See* Plnf. Exh. 30). Interestingly, one of the names Perez proposed to Mapes was "Hearth Castings of Vermont," a name she quickly rejected as being "too close to the popular VERMONT CASTINGS trademark used by your competitor." (*Id.;* Tr. 208). While Perez now maintains that he was never really serious about that name (Tr. 207), having offered it to Mapes only so as not to look too authoritarian to a young national sales manager (Tr. 209–10), and supposedly secure in the belief that she would ultimately reject it (Tr. II 45), this testimony is simply not credible. While the national sales manager may have coined or even championed the name, Perez's submission of it to Mapes is a clear indication that he was interested in coming as close as possible to the VERMONT CASTINGS trademark.

Another indicator of Perez's lack of credibility is his detailed testimony that it first occurred to him to use the VermontHearth trademark when he received that suggestion from his parent company in

11. Unfortunately, Perez's testimony generally lacked the ring of truth. For example, at one point he sought to maintain the preposterous position that he was unsure about whether his parent company even knew about Vermont Castings, and only later acknowledged that they probably did. (Tr. 206). Since Perez was the one who supposedly came up with the VermontHearth name as a trademark (*id.*), his credibility is particularly at issue.

12. Unlike Vermont Castings which both casts and assembles its stoves in Vermont, Hearth-Stone merely assembles them there after the iron is cast in Spain. (Tr. 213–14).

13. NHC sometimes depicts VermontHearth as two words, and sometimes as one. (Tr. 95, Exh. 20).

September 1997 (see Plnf. Exh. 26; Tr. II 46), a transparent fabrication given that he had already provided that name to Mapes more than two months earlier. (See Plnf. Exh. 30; Tr. II 98). Indeed, by July 1997, Mapes had informed Perez that "VERMONT HEARTH" was probably descriptive, and was not a mark that should be further researched. (Plnf Exh 30).

In short, this testimony reflects that Perez is simply not telling the truth when he describes how the VermontHearth name was selected. Indeed, it is much more likely that Perez and NHC were trying to come as close as possible to CFM's trademark so as to convert the name and goodwill of VERMONT CASTINGS to their own advantage.[14]

In any event, Perez apparently continued to urge the use of VermontHearth because in December 1997, Mapes wrote him with the results of a trademark search on the name. (Plnf Exh. 34; Def. Exh. P). In her letter, Mapes notes that while VERMONT CASTINGS is a "previously registered mark" for "stoves, heaters, [and] fireplace related products," it "is fairly distinguishable" from VermontHearth and thus represented "a low risk of opposition. . . ." (Id.). Consequently, while Mapes concluded that the search report revealed "some risks of challenge," she believed the name was available for use on stoves. (Id.). Perez apparently interpreted this as "the best we could get" and he decided to proceed with the VermontHearth name. (Tr. II 102–104).

Having decided to forge ahead, NHC planned to introduce the new VermontHearth product line and name at the March 1999 trade show in Phoenix, Arizona. CFM learned of this development and had its counsel write and demand that NHC "cease and desist" from any further use of the VermontHearth name and mark. (Plnf. Exh. 9; Tr 232). In response, NHC did not display the VermontHearth name or logo at the Phoenix show (Tr. 232; Tr. II 59), and it pulled some magazine ads; nevertheless, Mapes responded that NHC intended to use the VermontHearth mark since she had advised them that there was no likelihood of confusion. (Def.Exh. FF).

However, NHC has still only expended about $1,500 in advertising the VermontHearth name. (Tr. 221–2; Plnf. Exh. 39, Def. Interrog. Response No. 6), Indeed, HearthStone has postponed its marketing efforts pending the outcome of this suit, pulling for example, an ad slated for *Hearth and Home.* (Plnf. Exh. 92 [the Baldor Deposition] at pp. 27–9).

Around June 1, 1999, HearthStone began shipping its new VermontHearth stoves. (Tr. 216–17; Plnf. Exh. 23; Plnf. Exh. 92 at pp. 25–26). However, neither the stoves, nor their shipping carton, bear the VermontHearth trademark; in fact, the name only appears on the owner's manual which is located inside the stove and thus not visible to the customer until the stove is unpackaged. (Tr. 200–02). Last year, only 946 VermontHearth stoves were sold to about 100 HearthStone dealers, and many of those were apparently sold only as retail display models.[15] (Tr. 216, 218–20). In total, $751,867.68 in dealer sales under the VermontHearth name have been made. (Plnf.Exh. 90, Tr. 223). However, it is unlikely that many of these have been sold to the ultimate consumer

---

**14.** In September 1999, the President of Vermont Castings, Majestic Products Company, Ron Calvert, met with Perez in an effort to dissuade him from using the VermontHearth name. At that meeting, Perez told Calvert that he chose a name with Vermont in it because it implied great design and architecture and that he could achieve that image by adopting the name. (Tr. 234–5). Of course, that very image had actually come from Vermont Castings with its own "top to bottom" in-house designs. (Id.).

**15.** VermontHearth has not experienced much market penetration even among their own dealers. Normally, 350 dealers carry the HearthStone line of stoves. (Tr.II, 25). Put in perspective, the sale of VermontHearth stoves amounted to approximately 1/65th of Vermont Casting's stove sales. (Tr. 235–6).

given the seasonal nature of the trade.[16] (Tr. 221; Tr. II 132–3).

Because there are so few VermontHearth cast-iron stoves on the market, evidence of actual confusion cannot be expected, however, it cannot go unnoticed that the VermontHearth mark and accompanying logo are similar to the VERMONT CASTINGS trademark and logo in appearance and suggestion. (Tr. 95; *see* Plnf.Exhs. 16, 18, 20, 22–23, 28, and 40 (Vermont Hearth) and Exhs. 15, 41–48, 50–52 (Vermont Castings)). The VermontHearth logo is similar in that it bears the stylized depiction of a cast-iron stove, while the Vermont Castings logo bears a stylized view of a flaming hearth.[17] (*See, e.g.,* Plnf.Exhs. 5 and 15). Altogether, this design element does not avoid a likelihood of confusion with the VERMONT CASTINGS mark, and somewhat enhances the probability that confusion will result. This risk of confusion is heightened by the fact that many consumers are not sophisticated in the purchase of cast-iron stoves, notwithstanding the price. (Tr. 161–69). Moreover, Vermont Castings stoves have achieved such notoriety, that they are frequently referred to with abbreviated familiarity, such as: "Vermont," or among dealers, a "V.C." (Tr. 152). Given the similarity of the two marks,[18] lack of customer expertise, and the identical nature of the goods, consumer confusion, mistake, or deception is highly likely. (Tr. 93–96; 101–02; 165–70' 251–53). Indeed, this likelihood of confusion will probably grow given that HearthStone plans to develop a full line of gas and wood burning stoves, fireplaces, and other related hearth products,

all under the VermontHearth name. (Tr. 222–223).

If VermontHearth is allowed to continue, the damage to CFM/Vermont Castings would likely be irreparable. It would tend to blur the strong identity that Vermont Castings has achieved in the marketplace, and Vermont Castings would likely lose control of its own quality standards. (Tr. 251–53). On the other hand, it is unclear what profit HearthStone has achieved from the venture. In all likelihood, HearthStone's dealers would have purchased this initial offering of cast-iron stoves, and it appears that HearthStone cut its profit margins to help them introduce the product to the market. In fact, while Perez's accounting testimony is so tortuous that it cannot be ascertained with any certainty what NHC's profit have been, it would appear that on the whole the profit is minimal given that NHC lost money on every matte finished model sold. (Tr. II, 119).

## III. CONCLUSION OF LAW[19]

In order to prevail on its federal trademark infringement claim under 15 U.S.C. § 1114, its federal unfair competition claim under 15 U.S.C. § 1125(a), and its state common law unfair competition claim,[20] CFM must prove by a preponderance of the evidence that it owned prior rights in its VERMONT CASTINGS mark and that HearthStone's use of the VermontHearth mark will likely cause customer confusion, deception or mistake. *Knaack Mfg. Co., v. Rally Accessories, Inc.,* 955 F.Supp. 991, 999 (N.D.Ill.1997) (citing *Dunn v. Gull,* 990 F.2d 348, 351 (7th Cir.1993)). Since CFM

---

**16.** Perez somehow speculates that more than half have already been installed in homes. (Tr. II 68–9).

**17.** Perez was aware of the Vermont Castings logo when he adopted the VermontHearth logo. (Tr. II 94–5).

**18.** In its trademark application for VermontHearth, HearthStone disclaimed the second word, Hearth. (Plnf.Exh.11).

**19.** Fn. 2, *supra,* is incorporated here by this reference.

**20.** The analysis under the Lanham Act for trademark infringement and unfair competition also applies to claims of unfair competition under Indiana common law. *See Beacham v. Macmillan, Inc.,* 837 F.Supp. 970, 977 (S.D.Ind.1993); *Hammons Mobile Homes, Inc. v. Laser Mobile Home Transp.,* 501 N.E.2d 458, 461 (Ind.Ct.App.1986).

clearly holds the federal registrations for the prior VERMONT CASTINGS mark, the focus of the analysis is whether CFM has proven that use of the VermontHearth mark will likely cause consumer confusion in the marketplace about the identity or source of hearth products. *Id.* (citing *Reed–Union Corp. v. Turtle Wax, Inc.,* 77 F.3d 909, 912 (7th Cir.1996)).

However, while confusion might be deemed possible, or may have even been desired, CFM must show that consumer confusion is likely in order to enjoin use of the VermontHearth mark. *Rust Environment & Infrastructure, Inc. v. Teunissen,* 131 F.3d 1210, 1216 (7th Cir.1997). Such likelihood of confusion is a question of fact in this circuit. *Id.*

■ The test for likelihood of confusion is whether NHC's use of the VermontHearth name would cause CFM to lose a substantial number of customers. *Id.* In determining whether confusion is likely, seven factors are to be analyzed: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of defendant to 'palm-off his product as that of another.'" *Id.* (quoting *Smith Fiberglass Prod., Inc. v. Ameron, Inc.,* 7 F.3d 1327, 1329 (7th Cir.1993)). However, "none of the seven factors alone are dispositive, and the weight accorded to each factor will vary from case to case." *Id.* Moreover, when conducting this analysis, the Court must keep in mind "the realities of consumer behavior in the relevant market." *Rust,* 131 F.3d at 1216 (quoting *Dorr–Oliver, Inc. v. Fluid–Quip, Inc.,* 94 F.3d 376, 381 (7th Cir.1996)). Accordingly, these seven factors will be examined to determine whether consumer confusion is likely.

**A. Similarity of the Marks**

■ Trademarks are confusingly similar if they are similar in sound, appearance,

meaning or connotation. *Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.,* 80 F.Supp.2d 815, 880 (N.D.Ill. 1999) (citing *Knaack,* 955 F.Supp. at 1000; *Henri's Food Prod., Inc. v. Kraft, Inc.,* 717 F.2d 352, 354 (7th Cir.1983)). The court should consider any memorable feature of the marks when analyzing the likelihood of confusion, and "must consider the trademark as a whole in light of what occurs in the real world, recognizing that the marks will be confronted separately by consumers in the marketplace, rather than compared sitting side by side on a podium in the courtroom." *Planet Hollywood,* 80 F.Supp.2d at 880 (citing *Forum Corp. of North Am. v. Forum Ltd.,* 903 F.2d 434, 440 (7th Cir.1990); *Knaack,* 955 F.Supp. at 1000 (citing *James Burrough Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266, 275 (7th Cir.1976))).

In reviewing two marks, and while it is sometimes helpful to view two-word marks as a composite, it is also proper to give greater force and effect to the most salient feature, that is, the part of the mark that has the greater total impact upon the ordinary buyer, over and above the "peripheral" elements of the mark. *See,* 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION ¶¶ 23:44, 23:45 (4th ed.1999) [hereafter *McCarthy* ] (citing *Meridian Mut. Ins. Co. v. Meridian Ins. Group Inc.,* 128 F.3d 1111 (7th Cir.1997)). Normally, a disclaimed segment (*i.e.,* "Hearth") is not regarded as the dominant part of a mark. *Id.* at 23:45. Consequently, as noted earlier, the dominant term for both the buyer and dealer of hearth products has been the term "Vermont," achieving such familiarity among the consuming public that the product is sometimes simply referred to in the marketplace by its dominant first name. *See, e.g., Forum Corp. of North Am.,* 903 F.2d at 440 (focusing on the "dominant" or "salient" part of the mark); *Giant Food, Inc. v. Nation's Foodservice, Inc.,* 710 F.2d 1565, 1570 (Fed.Cir.1983). Such use also leads to confusing aural similarity (particularly

critical in initial phone contacts such as is likely here), notwithstanding NHC's suggestion that VermontHearth is actually one word. *Id.*

Of course, aside from the identical dominant first names of the two marks, in advertising literature both marks are either presented to the consuming public without accompanying designs, or with similar logos that depict either the front of a cast-iron stove (i.e. VermontHearth) or the front of a burning hearth (i.e. VERMONT CASTINGS). This overall visually graphic display suggests the same connotation for "hearth" and "castings," that both represent hearth products. *See, e.g., Nike Inc. v. "Just Did It" Enter.,* 6 F.3d 1225, 1229 (7th Cir.1993) ("The similarity issue also considers how the words are pronounced, the verbal translation of any graphic designs and whether they suggest similar ideas or meaning.") (citing *Jordache Enter. Inc. v. Hogg Wyld Ltd.,* 828 F.2d 1482, 1484–85 (10th Cir.1987); *SquirtCo v. Seven–Up Co.,* 628 F.2d 1086, 1091 (8th Cir.1980)). This comparison is particularly important because the names are generally not cast into the stoves, which means that the average consumer will generally encounter them only on advertising, not on the product itself.

Finally, while NHC argues that it has or will distinctively stylize its mark by font design, the capital letter registration of VERMONT CASTINGS covers all design variations for the use of its mark. *See, e.g., Cullman Ventures, Inc. v. Columbian Art Works, Inc.,* 717 F.Supp. 96 (S.D.N.Y. 1989); 3 *McCarthy* ¶ 23:52.

Thus, while the names are not identical, the overall commercial impression reveals that the similarities between the two marks outweigh the differences such that consumers are likely to confuse one for the other. *Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.,* 748 F.2d 669, 673 (Fed.Cir.1984) (commercial impression of SPICE ISLANDS and SPICE VALLEY confusingly similar, and when balancing interests, doubts are resolved against the newcomer).

**B. Similarity Between the Products**

■ "In determining the likelihood of confusion that exists due to the similarity between the parties' products, 'the question is whether the products are the kind the public attributes to a single source.' " *Blue Cross and Blue Shield Assoc. v. American Express Co.,* 1999 WL 1044825, *4 (N.D.Ill. Nov. 16, 1999) (quoting *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1089 (7th Cir.1988)). "Where the goods are in close competition, trademarks need not be as similar in order to find an infringement." *Nike Inc.,* 6 F.3d at 1230 (citing *SquirtCo,* 628 F.2d at 1091). Here, both companies directly compete in the marketing of similarly-priced, high-quality cast iron stoves for residential heating. *See id.* (finding similarity of product when the defendant marketed its parody of the same types of items that the plaintiff sold). While NHC hyper-technically argues that the stove architecture for the two competing lines is different, this aesthetic distinction is of no legal significance since the relevant inquiry is on the types of products involved. *McGraw–Edison Co. v. Walt Disney Productions,* 787 F.2d 1163, 1169 (7th Cir. 1986) ("The question is whether the products are the kind the public attributes to a single source."). Given such a test, this element has clearly been established. Therefore, this factor strongly suggests that consumer confusion is likely.

**C. Area and Manner of Concurrent Use**

■ This "factor requires the Court to consider whether there is a relationship in use, promotion, distribution or sales between the goods and services of the parties." *Planet Hollywood,* 80 F.Supp.2d at 882 (citing *Forum Corp.,* 903 F.2d at 442). Here, both NHC and CFM utilize the same national distribution channels, and often the very same dealers, for ultimate retail sale to identically-targeted consum-

ers. Both NHC and CFM also attend the same national trade shows at which their products are displayed. Moreover, both parties publish advertisements in the same trade publications and generally use the same promotional strategies, albeit on different scales. Therefore, since the area and manner of concurrent use is the same, this factor also points to a likelihood of consumer confusion.

**D. Degree of Care**

██ "Since the likelihood of confusion inquiry considers the likelihood of confusion by the consuming public, courts must consider the level of sophistication of potential purchasers of the products and services in issue." *Planet Hollywood*, 80 F.Supp.2d at 882 (citing *Forum*, 903 F.2d at 442). "Where consumers are sophisticated, deliberate buyers, confusion is less likely than where the consumers are prone to make uninformed, impulse purchases." *Id.* (citing *Smith Fiberglass Prods.*, 7 F.3d at 1330; *Rust*, 131 F.3d at 1217). However "the Lanham Act forbids a competitor from luring potential customers away from a producer by initially passing off its goods [or services] as those of the producer's even if confusion as to the source of the goods is dispelled by the time any sales are consummated." *Rust*, 131 F.3d at 1217 (quoting *Dorr–Oliver*, 94 F.3d at 382).

Applying those principles here, everyone agrees that cast-iron stoves are expensive, which means that cast-iron stove buyers are arguably "discriminating purchasers." (*see, e.g.*, 3 *McCarthy* at ¶ 23:96). However, this supposed degree of sophistication cannot be relied upon here to prevent confusion. *Computer Care v. Service Sys. Enter., Inc.*, 982 F.2d 1063, 1070 (7th Cir. 1992) ("Nor does the fact that Computer Care's customers are "sophisticated" … mean that, as a matter of law, there is no likelihood of confusion."). This is particularly true give "the realities of consumer

behavior in the relevant market." *Rust*, 131 F.3d at 1216.

For example, at the retail level the first contact with the dealer often starts off with a customer phone call, hence the high potential for auditory confusion, and the dealer naturally utilizes this first contact to get the customer to visit his store. This is frequently easy to do, no matter what product line the dealer offers, because the initial level of customer sophistication often is quite low. This is best illustrated by the fact that many consumers spend several hours speaking with dealers to determine which stove will best suit their needs, and indeed, some customers visit a dealer several times before making a final decision. Nonetheless, once in a store, a customer is likely to stay as a matter of convenience to at least see what the dealer has to offer, even though he has come to realize that a mistake has been made.[21] *Blockbuster Entertainment Group v. Laylco, Inc.*, 869 F.Supp. 505, 513 n. 2 (E.D.Mich.1994).

The danger for CFM in all this is that a potential customer, perhaps initially interested in a Vermont Castings stove (inspired no doubt by the advertising or reputation) makes initial contact with either a dealer who does not carry the Vermont Castings line, but does carry VermontHearth, or carries both, but is financially-motivated to push the VermontHearth line. With the similarity in the marks, the identical nature of the products, and the overlapping market, even a relatively sophisticated consumer could easily be led to some initial confusion. Thus, either on the phone, or once in the dealer's door, a potential consumer might mistakenly think, or be led to believe, there was a connection between Vermont Castings and VermontHearth, at least long enough to consider that brand of stove, even if a later investigation revealed there was no connection. *See, Dorr–Oliver, Inc.* 94 F.3d at

---

**21.** Because dealers are generally specialty shops, it is likely that there will be a considerable distance from one dealer to the next.

382; *Forum Corp.*, 903 F.2d at 442 n. 2; *Grotrian, Helfferich, Schulz v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir.1975) ("The harm to Steinway ... is the likelihood that a consumer, hearing the 'Grotrian–Steinweg' name and thinking it had some connection with 'Steinway,' would consider it on that basis. The 'Grotrian–Steinweg' name therefore would attract potential customers based on the reputation built up by Steinway ... for many years. The harm to Steinway in short is the likelihood that potential piano purchasers will think that there is some connection between the Grotrian–Steinweg and Steinway pianos."); *Porsche Cars North Am., Inc. v. Manny's Porshop, Inc.*, 972 F.Supp. 1128, 1131 (N.D.Ill.1997) ("[E]ven if sophisticated customers eventually discover that Manny's is not related to plaintiffs, a trademark violation can exist simply from the initial confusion."); 3 *McCarthy* at ¶ 23:6. This danger is compounded by the apparent ability of dealers to steer customers (NHC seemingly deems it "consumer education") to a certain brand of stove based on nothing more than existing inventory, industry sales promotions or product knowledge. Thus, misled into an initial interest, the potential Vermont Castings customer may satisfy himself (helped along by the dealer) that the VermontHearth stove is just as good, if not a better buy, and thus such deception and confusion works to appropriate Vermont Castings' good will. *Id.* As a consequence, a proper analysis of this factor also points to a likelihood of consumer confusion.

**E. Strength of the Mark**

■ "The strength of a trademark refers to its 'distinctiveness ..., or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular ... source.'" *Planet Hollywood*, 80 F.Supp.2d at 882 (citing *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 959 (7th Cir.1992) (quoting *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979))).

Both sides start out by arguing the conceptual strength of the VERMONT CASTINGS mark. 2 *McCarthy* ¶ 11:83. CFM contends that VERMONT CASTINGS is an arbitrary mark that has achieved strength through hard-won fame. NHC, on the other hand, contends that the VERMONT CASTINGS mark is inherently weak because it is geographically descriptive. In reality, while the VERMONT CASTINGS mark might be deemed geographic if we simply looked at its first component, in composite it loses its geographic connotation. Indeed, as discussed *infra*, in composite the total commercial impression of the VERMONT CASTINGS mark is one of significant strength. 2 *McCarthy*, ¶¶ 11:83, 14:11.

This strength comes from the fact that Vermont Castings virtually started the market for high quality, cast-iron stoves a generation ago. Since its inception, Vermont Castings, and now CFM, have consistently promoted and advertised the VERMONT CASTINGS mark, building a virtually unparalleled reputation for quality in the industry. Indeed, CFM spends over three million dollars each year on targeted regional, national, and Internet advertising; advertising for example, by direct mail, and through newspapers and magazines as well as cable television. In addition to these efforts, Vermont Castings fosters customer loyalty through newsletters and yearly Vermont parties for its stove owners. These efforts, and the mark's reputation, have attracted overwhelmingly favorable national media attention. *See, e.g.,* n. 3 *supra*.

Through such efforts, the name VERMONT CASTINGS has become virtually synonymous with high quality hearth products and has achieved recognition far beyond the minimum necessary for what is commonly called "secondary meaning." Indeed, not only has the name become highly recognized, but it has now gained such familiarity that in some instances it is shortened by stove devotees to simply "Vermont" (as in "My Vermont") or as

known among dealers, a "V.C." This all illustrates that the consuming public clearly associates the VERMONT CASTINGS mark with its high-quality, cast-iron stoves (and its other hearth products as well), and leads to the inference that the VERMONT CASTINGS name has achieved nearly palpable commercial strength from its fame or uniqueness. *Telemed Corp. v. Tel–Med, Inc.*, 588 F.2d 213, 219 (7th Cir.1978) (a mark is "strong" because its fame, uniqueness, and volume of usage give it an edge in the marketplace). Indeed, NHC is somewhat at a loss to dispute this notion given that its own counsel, upon being asked to do a trademark search, characterized the VERMONT CASTINGS mark as so "popular" that no search was necessary.

While some evidence was presented that a small, long-defunct wood stove company, Vermont Ironworks, also used the "Vermont" name some fifteen to twenty years ago, this is insufficient to weaken the strength of the "VERMONT CASTINGS" mark. *See, e.g., Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 155 (9th Cir.1963) (prior acts by other infringers constitutes no defense or justification for the defendant's subsequent infringement); *James Burrough Ltd. v. Lesher*, 309 F.Supp. 1154, 1160 (S.D.Ind. 1969) ("the fact that others may have used or infringed a trademark is irrelevant to the question of plaintiffs' right to relief."). Indeed, the Vermont Ironworks was so insignificant a player in the wood stove industry (apparently, even in its home state of Vermont) that Vermont counsel for NHC were not even aware of its existence until they happened to stumble across such a stove during the Thanksgiving holidays. Moreover, there is no evidence that any third-party use of the name "Vermont" currently occurs within the hearth industry. For all these reasons, the court concludes that VERMONT CASTINGS is a strong mark.

### F. Actual Confusion

■ "The test of infringement is the *likelihood* of confusion, not the proof of *actual* confusion." 3 *McCarthy*, ¶ 23:12 (emphasis in original). Accordingly, "[t]he plaintiff is not required to prove any instances of actual confusion." *Id.; See also, Sands, Taylor & Wood Co.*, 978 F.2d at 960; *Tisch Hotels, Inc., v. Americana Inn, Inc.*, 350 F.2d 609, 611–13 (7th Cir. 1965).

Indeed, while CFM presented no evidence of actual confusion at trial, its absence is easily understood. First, upon hearing of NHC's efforts to promote the NHC line, CFM caused a "cease and desist" letter to issue, effectively causing NHC to stop almost all promotional efforts. After later learning that NHC had actually shipped some VermontHearth stoves, CFM filed for a preliminary injunction. This effectively ended NHC's introduction of the stoves into the market, except for 946 stoves shipped from August to December 1999 to approximately 100 dealers. However, even the shipped stoves did not bear the VermontHearth mark, and the name only appears in the owner's manual packed inside each stove. Consequently, up until now, most prospective stove consumers would not have encountered the VermontHearth name, particularly since NHC has spent virtually nothing in advertising. Thus, the absence of evidence of actual confusion is not surprising given the brief time the products have "competed" in the market. *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1227 (2d Cir.1987) ("The absence of [actual confusion] proof is not especially significant in the present case, particularly given the short time before trial—four months—in which the marks were 'competing.' "); *Frank Brunckhorst Co. v. G. Heileman Brewing Co.*, 875 F.Supp. 966, 980 (E.D.N.Y.1994) (". . . the absence of actual confusion is less significant when, as is the case here, the period in which the two products have coexisted [*i.e.*, seven months] is a short one."). Moreover, since stove companies generally do not receive any consumer feedback un-

til the stove has been installed through a burn-season, it is quite likely that actual consumer confusion will not surface until this spring.

While NHC makes much of the fact that CFM offered no survey results demonstrating a likelihood of consumer confusion, such evidence is by no means mandatory, particularly where there exists a clear inference of confusion from a comparison of the conflicting marks and the context of their use. *See, Badger Meter v. Grinnell Corp.*, 13 F.3d 1145, 1153 (7th Cir.1994) ("... [Defendant] argues strenuously that [Plaintiff's] failure to introduce any market survey evidence of likely consumer confusion militates against finding such a likelihood; once again, however, this goes to the weight and not to the sufficiency of the evidence."); *see also,* 3 *McCarthy* § 23:2.1.

Accordingly, while there is no evidence of actual confusion, the Court cannot infer from this that confusion is unlikely.[22]

### G. NHC's Intent

■ In the Seventh Circuit, an intent to confuse, or evidence of deliberate copying, is one of several factors to be weighed in determining a likelihood of confusion and infringement. 3 *McCarthy* at ¶ 23:111. "If a court finds intent (i.e., deliberate imitation of a mark), this factor weighs heavily in favor of finding likelihood of confusion." *Planet Hollywood*, 80 F.Supp.2d at 884. *See also, Rust*, 131 F.3d at 1219; *Computer Care*, 982 F.2d at 1070.

It is important that we focus our analysis upon the intent of Perez because he was apparently the sole decision-maker when it came to adopting the VermontHearth name. In so doing, we know he was well aware of the fame of the "VERMONT CASTINGS" name, an inescapable conclusion for anyone in the hearth industry. This is important because it leads to a fair inference, drawn by this Court, that NHC, as the junior user, adopted the mark for the purpose of profiting from the aura of goodwill surrounding the VERMONT CASTINGS mark. 3 *McCarthy* at ¶ 23:114; *see also, Tisch Hotels*, 350 F.2d at 613 (adoption of the senior user's name was done "deliberately with a view to obtaining some advantage from [the senior user's] investments in promotion and advertising"); *Fleischmann Distilling Corp.*, 314 F.2d at 157 (adoption with the purpose of "capitaliz[ing] upon the popularity of the name chosen."). After all, while Perez was free to chose from a whole host of names for his new cast-iron stove line, his unconvincing testimony is that it was all merely a "coincidence" that the name he selected was close to the name of the highly-regarded industry leader. *See, Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 704 (5th Cir. 1981) ("It is so easy for a business man who wishes to sell his goods upon their merits to select marks and packagings that cannot possibly be confused with his competitor's that 'courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to

---

22. In its motion to reopen the record CFM seeks to offer evidence of actual and recent consumer confusion on the part of one person who purchased a VermontHearth stove apparently thinking it to be a Vermont Castings model. In determining whether to reopen, fairness is the key criterion. *Blinzler v. Marriott Int., Inc.*, 81 F.3d 1148, 1160 (1st Cir. 1996) (*citing, Rivera–Flores v. Puerto Rico Tel. Co.*, 64 F.3d 742, 746 (1st Cir.1995)). "The specific factors to be assessed include the probative value of the evidence sought to be introduced, the proponent's explanation for failing to offer the evidence earlier, and the

likelihood of undue prejudice." (*Id.*). Here, one isolated incident of alleged consumer confusion is insufficient to reopen the record because such an instance "does not compel the conclusion that confusion is likely." *S Indus., Inc. v. GMI Holdings, Inc.*, 1998 WL 67627 at *8 (N.D.Ill. Jan. 30, 1998). Moreover, reopening the trial (and another round of discovery too) is simply unnecessary given that even without evidence of actual confusion, CFM will prevail. *See, Blinzler*, 81 F.3d at 1160 ("The prospect of prolonging the trial is also material."). Consequently, CFM's motion to reopen the trial will be denied.

distinguish between them.' ") (*quoting*, *Florence Mfg. Co. v. J.C. Dowd & Co.*, 178 F. 73, 75 (2d Cir.1910)) *cert. denied*, 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982). *See also, Caesars World, Inc., v. .Caesar's Palace*, 490 F.Supp. 818, 826, (D.N.J.1980) (contentions of coincidence "lack credibility"); Tr. 213.

Of course, Perez points out that Hearth-Stone is proud to be a Vermont company and that in deciding upon a name for NHC's new line of cast-iron stoves, he wanted to use the word "Vermont" to draw upon the reputation for quality associated with the state. Curiously, however, during the preceding eight years that Perez had been president of NHC the company had done virtually nothing to trumpet "Vermont" in any of its advertising, or even its affiliation with the state. In fact, it was not until NHC sought to enter the all cast-iron stove market that there was any interest on the part of HearthStone in promoting its association with the state of Vermont. On the whole, what Perez truly intended was what he confessed to CFM's president, that "Vermont" was selected to instantly achieve high-quality design identity for NHC. However, this connection between the name "Vermont" and design superiority had been created by Vermont Castings' dint of effort, and directly supports the conclusion that NHC's true intent here was to come as close as possible to the VERMONT CASTINGS name, to trade on that reputation and to possibly confuse the buying public.

Moreover, Perez's *post hoc* justifications are not credible. First, he claims that he wanted VermontHearth as a new trade name for this new line of products so that they would not be associated with the old "HearthStone" name, apparently because he wanted to "create different programs and different treatment for this new product line," with the understanding that if NHC's current dealers chose not to carry the line, he would be free to offer it to new dealers without violating dealer exclusivity agreements. (Tr. I. 213–14; Tr. II. at 41–42). However, this rationale conflicts with why NHC ostensibly decided to build a cast-iron stove line, supposedly to offer a greater range of products to dealers "tired of … carrying ten or twelve different brands, and having to deal with ten or twelve different companies and different programs." (Tr. II. at 30). In short, it is hard to understand how creating an entire new brand did anything to cure what Perez professed to be a fundamental marketing problem. Moreover, Perez's pretense is further undercut by the fact that the VermontHearth sell sheets continue to prominently display the "HearthStone" name. *See*, Plnf Exhs. 20, 40. This inherent conflict in Perez's testimony leads to a discounting of it in favor of the much more likely motivation, that the name was adopted to trade upon the VERMONT CASTINGS mark.

Additionally, the process by which Perez chose the VermontHearth name also raises suspicions. When Perez first undertook to come up with a new product name he submitted several potential names to counsel for a trademark search, including "HEARTH CASTINGS of VERMONT," an all-too-transparent reference to "VERMONT CASTINGS." At trial, Perez unconvincingly testified that he was never really serious about that name, knew that counsel would reject it as too close to the VERMONT CASTINGS mark, and merely submitted it for a trademark search because he did not want to be too authoritarian with the sales manager who suggested it. This testimony seems unbelievable on two fronts: it is hard to believe that CEO's in general, and Perez in particular, would submit potential trademarks to outside counsel for expensive legal opinions merely because they were too timid to reject some underling's ill-conceived idea. Rather, Perez's actions lead to a much more likely inference, that his true intent all along was to come as close as possible to the VERMONT CASTINGS mark in the hopes of inciting some consumer confusion about whether there was a connection between

VermontHearth and Vermont Castings. *See, AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1543 (11th Cir.1986) ("... the record supports the district court's finding that Kraft intended to benefit from the goodwill Isaly has built for itself."); *See also*, 3 *McCarthy* ¶ 23:116 ("... coming close with the intention to confuse customers into thinking that there is some affiliation or connection is evidence that the junior user succeeded in achieving its goal.").

Indeed, the fact that Perez submitted the VermontHearth name to Mapes for a trademark search does not excuse NHC from the adoption and use of the confusingly similar mark. In fact, Perez's suggestion to Mapes that she give an opinion as to Hearth Castings of Vermont should have revealed to Mapes that what Perez was seeking here was some legitimacy for coming as close to the VERMONT CASTINGS mark as the law would allow. *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 977 (11th Cir.1983); *Bear U.S.A. v. A.J. Sheepskin & Leather Outerwear*, 909 F.Supp. 896, 907 (S.D.N.Y.1995); *Universal City Studios, Inc. v. Mueller Chemical Co., Inc.*, 223 U.S.P.Q. 798, 799 (N.D.Ill.1983); *Chevron Chem. Co.*, 659 F.2d at 704.

Unfortunately, Perez's testimony also lacked credibility when he tried to explain how NHC settled upon the VermontHearth name. Apparently in an effort to distance himself from the actual selection, and any resulting scrutiny of his own intent, Perez claimed at trial that NHC's Spanish parent company initially came up with the VermontHearth name in September 1997, a position incapable of withstanding scrutiny given that more than two months earlier he had personally given the name to NHC's trademark counsel. This further demonstrates that Perez has been less than truthful about the reasons behind the selection of the name, his own involvement, and likely intent.

Therefore, based on the strength of this evidence, a reasonable inference arises that the consuming public either has been, or will be confused by the introduction of VermontHearth into the market. *See, e.g., Rust*, 131 F.3d at 1219.("... the difficulty in determining the state of mind of consumers has led courts to draw a reasonable inference from the state of mind of the accused infringer.") (quoting 2 *McCarthy*, at § 23:110).

## H. Summary

■ Considering all of the foregoing factors, and given the similarity between the two marks, the virtually identical products, the area and manner of concurrent use, the strength of the VERMONT CASTINGS mark, as well as NHC's apparent intent to come as close as possible to the VERMONT CASTINGS name, I conclude that while the case is close, there is a likelihood of consumer confusion between the VERMONT CASTINGS mark and the VermontHearth name. Accordingly, I will grant judgment to CFM on all counts of its complaint. Having found infringement, and unfair competition, it is now time to turn to the appropriate remedies for CFM, including permanent injunctive relief, possible disgorgement by NHC of any improper profits, costs, and attorney's fees. We will address each remedy in turn.

## Injunctive Relief

■ "The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that in seeking a permanent injunction, [CFM] must prove actual success on the merits rather than the likelihood of success on the merits." *Hicks v. Peters*, 10 F.Supp.2d 1003, 1004 (N.D.Ill.1998) (citing *Hope Clinic v. Ryan*, 995 F.Supp. 847, 853 (N.D.Ill.1998)); *see also, Plummer v. American Institute of Certified Pub. Accountants*, 97 F.3d 220, 229 (7th Cir.1996). Therefore, to obtain a permanent injunction, CFM must show (1) actual success on the merits; (2) that it does not have an adequate remedy at law or that it will suffer irreparable harm without an injunction; (3) the balance of harms

between the parties favors entering the injunction; and (4) entry of the injunction will not harm the public interest. *Chicago Sch. Reform Bd. or Trustees v. Diversified Pharm. Servs. Inc.,* 40 F.Supp.2d 987, 991 (N.D.Ill.1999) (citing *Hicks,* 10 F.Supp.2d at 1004 (citing *Plummer,* 97 F.3d at 229)). As discussed *supra,* CFM has prevailed on the merits and therefore we will confine our analysis to the other three factors.

 CFM must show that it does not have an adequate remedy at law or that it will suffer irreparable harm if the Court denies its request for a permanent injunction. Infringement of trademark rights causes irreparable harm, even absent a showing of business loss. *Porsche Cars,* 972 F.Supp. at 1132 (citing *Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 16 (7th Cir.1992)). The Seventh Circuit has found that damages caused by trademark infringement and dilution are by their very nature irreparable and are not susceptible to a remedy at law. *Id.* (citing *International Kennel Club,* 846 F.2d at 1092). Moreover, "[t]he presumption is well-established in this circuit that injuries arising from Lanham Act violations are irreparable, even absent a showing of business loss." *Avent Am., Inc. v. Playtex Prod. Inc.,* 68 F.Supp.2d 920, 932–33 (N.D.Ill.1999) (quoting *Abbott Laboratories,* 971 F.2d at 16). Therefore, since NHC has infringed on CFM's trademark, irreparable harm will likely result if the Court does not impose a permanent injunction.

The third factor in the analysis is the balance between the harm that NHC will suffer if the injunction is granted and that which CFM will suffer if it is denied. *Meridian Mut. Ins. Co.,* 128 F.3d at 1120–21. In this regard, NHC has not offered much in the way of any real harm from the granting of an injunction, having spent next to nothing marketing the new line of VermontHearth stoves. Indeed, if the Court enjoined NHC from using the VermontHearth name, it would merely have to reprint some dealer sell sheets and remove the name from the stove owner manuals, overall a minor inconvenience.

On the other hand, CFM will likely suffer great harm if an injunction is not granted. CFM spent millions of dollars acquiring Vermont Castings, and millions more promoting its VERMONT CASTINGS products, all to maintain the preeminent position in the cast-iron stove business. If an injunction is not issued, that money will have been spent not for the benefit of CFM alone, but also for the unearned benefit of NHC. Moreover, every lost sale experienced by CFM will most likely be permanent given that cast-iron stoves have a long life. This potential harm will arise even if NHC's product proves to be inferior, since it will likely harm Vermont Castings' reputation. This potential for harm easily surpasses the inconvenience and modest expense that NHC will suffer from simply choosing a new non-confusing name for its cast-iron stoves.

The fourth factor to consider is the public interest, which is "the effect that granting or denying the injunction will have on nonparties." *Meridian Mut. Ins. Co.,* 128 F.3d at 1121 (quoting *Grossbaum v. Indianapolis–Marion County Bldg. Auth.,* 100 F.3d 1287, 1291 (7th Cir.1996)). Thus, in so doing, the court must balance the public's interest to be free from deception against the interests of free competition in the marketplace. *Club Gene & Georgetti Ltd. Partnership v. LaLuna Enter., Inc.,* 889 F.Supp. 324, 327 (N.D.Ill.1995); *GB Elec., Inc. v. Thomas & Betts Corp.,* 1995 WL 795660, at * 10 (E.D.Wis. July 28, 1995). *See also, Schwinn Bicycle Co. v. Diversified Products Corp.,* 740 F.Supp. 517, 519 (N.D.Ill.1990) ("The paramount interest promoted by the Lanham Act is the right of the public not to be confused about the origin of goods.") (citing *James Burrough Ltd.,* 540 F.2d at 274).

Here, the interest of the public in not being confused about the origin of goods strongly outweighs the virtually nonexistent harm that might occur to marketplace

competition if an injunction would issue. Indeed, CFM is not asking that the Court enjoin the sale of NHC's new cast-iron stoves, only that they not be allowed to use the confusingly similar VermontHearth name which in all likelihood would mislead the consuming public about the product's origin. *C.f., Storck v. Nabisco, Inc.,* 59 F.3d 616, 619 (7th Cir.1995) (reversing injunction that would postpone the introduction of a new product when the district court only found that confusion was possible).

Therefore, taking all these factors together, CFM has shown that an injunction should issue.

## Monetary Relief

██ Since no evidence of actual confusion was presented at trial, CFM is not entitled to recover damages from NHC. *Web Printing Controls Co. v. Oxy–Dry Corp.,* 906 F.2d 1202, 1205 (7th Cir.1990). However, "other avenues of relief" are not foreclosed to CFM and it may seek recovery of NHC's profits, an award of costs of the action, and if it shows this is an "exceptional case," an award of attorney's fees. *Id.* Nevertheless, "[r]emedies are intended to make violations of the Act unprofitable, but not to act as a penalty." *BASF Corp. v. Old World Trading Co., Inc.,* 41 F.3d 1081, 1092 (7th Cir.1994) (citing *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.,* 754 F.2d 738, 742 (7th Cir. 1985)). However, as the Seventh Circuit has noted, many of the remedies available under the Lanham Act "flow not from the plaintiff's proof of its injury or damage, but from its proof of the defendant's unjust enrichment or the need for deterrence." *Web Printing,* 906 F.2d at 1205.

The Lanham Act specifically allows a plaintiff to recover the defendant's profits, as a result of infringement, subject to "equitable considerations." *Sands, Taylor & Wood Co.,* 978 F.2d at 961. However, "[t]he trial court's primary function is to make violations of the Lanham Act unprofitable to the infringing party." *Id.* (citing *Roulo v. Russ Berrie & Co.,* 886

F.2d 931, 941 (7th Cir.1989)), *cert. denied,* 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990) ("Award of profits was appropriate under either a deterrence or unjust enrichment theory even if plaintiff's actual sustained losses may have been less."). Consequently, profits are awarded under different rationales including unjust enrichment, deterrence, and compensation. *Id.*

Here, on the facts of this case, it is clear that CFM has effectively put a stop to the marketing and selling of VermontHearth stoves except for the 946 VermontHearth stoves sold to approximately 100 Hearth-Stone dealers. However, since this was a new product for HearthStone, and its first introduction to the all cast-iron stove market, it is entirely likely that these dealers would have bought the stoves regardless of the VermontHearth name. Consequently, there has been no showing that NHC was unjustly enriched from utilization of the VermontHearth name, nor has it been shown that CFM is entitled to compensation as a result. Stated somewhat differently, to date it does not appear that NHC's violation of the Lanham Act has been profitable, and given these "equitable considerations," awarding NHC's profits to CFM would not appear to be either necessary, or a particularly effective deterrent.

Moreover, while seeking lost profits, CFM is only required to prove NHC sales, and it is then up to NHC to prove all claimed cost elements or deductions. 15 U.S.C. § 1117(a). Thus, while the evidence is far from over-whelming, it would appear that if NHC made any profit from the sale of its all cast-iron stoves, it was slight, particularly since NHC sustained a loss on every matte model sold. Thus, while compensation can be awarded even where the infringer loses money, *see Otis Clapp & Son,* 754 F.2d at 744, under the circumstances of this case, and for the reasons stated *supra,* the Court has determined that there will be no disgorgement of NHC's alleged profits.

### Attorney's Fees

The Lanham Act grants the Court discretion to award reasonable attorney fees to the prevailing party in exceptional cases. 15 U.S.C. § 1117(a): Exceptional cases include those where the defendant's acts of infringement are "malicious, fraudulent, deliberate or willful." *BASF Corp.*, 41 F.3d at 1099 (quoting *Roulo*, 886 F.2d at 942); 5 McCarthy, § 30:100. Here, no evidence suggests that NHC acted maliciously or fraudulently when adopting the VermontHearth trademark, so the inquiry focuses on whether its acts were deliberate or willful.

Attorney fees are awarded when the defendant commits "truly egregious, purposeful infringement, or other purposeful wrongdoing." *Badger Meter, Inc.*, 13 F.3d at 1159 (no attorney fees when "the question of functionality was close enough to remove the case from the ambit of an 'exceptional case' ") (quoting *Service Ideas, Inc. v. Traex Corp.*, 846 F.2d 1118, 1125 (7th Cir.1988)); *see also, Roulo*, 886 F.2d 931 (no attorney fees when defendant made a conscious effort to create elements of dissimilarity between products); *Cf. Otis Clapp & Son, Inc.*, 754 F.2d at 746 (the defendant's 'targeting' of the plaintiff in its literature created exceptional case for attorney fees); *Gorenstein Enterprises, Inc. v. Quality Care—USA, Inc.*, 874 F.2d 431, 435, 437 (7th Cir.1989) (upholding attorney fee award when the defendants were "holding the trademark hostage as a bargaining tactic" and litigated the suit in bad faith).

Moreover, when a defendant continues to infringe on a plaintiff's mark after receiving a cease and desist letter, that infringement may be deemed deliberate, and is sufficient to award attorney fees. *AT&T Corp. v. Synet, Inc.*, 1997 WL 89228, at * 11 (N.D.Ill. Feb. 11, 1997) (citing *Badger Meter, Inc.*, 13 F.3d at 1158–60); *see also, E. & J. Gallo Winery v. Consorzio del Gallo Nero*, 782 F.Supp. 472, 475 (N.D.Cal.1992) (using infringing mark after warning about potential infringement is strong evidence of wilful infringement).

Here, although the issue is a close one, the Court does not believe that CFM has sustained its burden of proving that NHC's infringement of the VERMONT CASTINGS mark was carried out in a deliberate or wilful manner, that is, with the necessary egregiousness to support an award for such fees. *See, Badger Meter*, 13 F.3d at 1160. For example, while NHC may have wanted to come close to the VERMONT CASTINGS name, even deliberate copying does not necessarily entail deliberate infringement. *Id.* Indeed, attorney fees have been denied where the infringer apparently sought to come as close to the plaintiff's trade name as the law allowed, but was armed with a well intended letter from trademark counsel stating that there was no infringement. *Lon Tai Shing Co. v. Koch + Lowy,* , 1992 WL 18806, 21 U.S.P.Q.2d 1858, 1861 (S.D.N.Y.); *see also, Sovereign Order of St. John of Jerusalem, Inc. v. Grady*, 119 F.3d 1236, 1244 (6th Cir.1997) (Attorney fees denied despite the jury's explicit finding of intentional infringement because while the defendant knew he was using the trademark, he did not know that its use was contrary to law.); *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.*, 1982 WL 63787, 218 U.S.P.Q. 440, 443 (N.D.Tex.1982).[23]

Applying those principles here, Perez apparently sought to come as close as possible to the VERMONT CASTINGS mark as the law would allow, yet not infringe. His efforts to consult with trademark counsel, and his reliance on their opinion, reflect this purpose even after receiving the cease and desist letter. Thus, this behavior was reasonable, and adds some additional weight to the conclusion that

**23.** In *Chevron*, the 5th Circuit remanded for the purpose of allowing the district court to enter an "appropriate injunction," 659 F.2d at 697, however, while the district court imposed an injunction, it granted no further relief including attorney fees.

there should be no award of attorney fees. *Lon Tai Shing Co.*, 21 U.S.P.Q2d at 1861; *Pyramid Technology Corp. v. Pyramid Technology, Inc.*, 1993 WL 302894, 28 U.S.P.Q.2d 1711, 1714 (E.D.La.1993). Consequently, CFM's request for attorney fees will be denied.

## IV: CONCLUSION AND ORDER

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED:

(1) The two motions of NHC pursuant to Fed.R.Civ.P. 52 are hereby DENIED;

(2) CFM's motion to reopen the trial is hereby DENIED;

(3) CFM's request for a permanent injunction is hereby GRANTED, and the Defendant, its officers, directors, predecessor, successors, assigns and others in active concert or participation with Defendant are permanently enjoined and restrained from directly or indirectly using the name "VermontHearth" or any other mark, word, name or trade name containing "VermontHearth";

(4) IT IS FURTHER ORDERED that the Plaintiff is entitled to an award of costs and any bill of costs must be filed in accordance with N.D.Ind.L.R. 54.1;

(5) the Plaintiff's request for damages, lost profits, and attorney fees is hereby DENIED.